OPINION
{¶ 1} Plaintiffs-appellants, Sue Griffin, Debra Bope, Roger Myers, Reid Stevens, Mark Campolito, Ruth Canter, Amber Stanton, Benjamin Stanton, Kira Stanton and Greg Stanton, appeal from a judgment of the Ohio Court of Claims, finding in favor of defendant-appellee, Twin Valley Psychiatric Systems (formerly known as Central Ohio Psychiatric Hospital "COPH"), on appellants' negligence action.
 {¶ 2} On January 24, 2001, appellants filed a negligence, wrongful death and survivorship action against appellee. The complaint alleged that appellee, through its staff, negligently treated and discharged a former psychiatric patient, Jerry Hessler, who committed multiple murders and caused other physical injury to a number of individuals on November 19, 1995, four months after his release from appellee's facility on July 20, 1995.
 {¶ 3} The case came before the Court of Claims for a bench trial on the issue of appellee's liability for the actions of Hessler. At trial, appellants withdrew their claim that appellee failed to warn potential victims, and proceeded with the theory that appellee negligently treated and discharged Hessler, and that such negligence proximately caused the patient's violent acts.
 {¶ 4} The Court of Claims rendered a decision on June 5, 2002, including findings of fact and conclusions of law, summarized as follows: On May 10, 1995, Carlene Hessler, the mother of Jerry Hessler, consulted Pamela Craycraft, a licensed independent social worker at the Columbus Area Community Mental Health Center ("CACMHC"), regarding her son's violent activities toward herself and others. As a probate pre-screen clinician, Craycraft interviewed and evaluated Hessler on May 11, 1995, and recommended psychiatric hospitalization. Craycraft also arranged for Hessler to be examined by Dr. Basobas, CACMHC's admitting psychiatrist.
 {¶ 5} With Craycraft's assistance, the patient's mother initiated proceedings in the Franklin County Probate Court for her son's involuntary commitment, using a form affidavit containing statutory commitment allegations that her son represented a "substantial risk of physical harm to others" as manifested by evidence of recent violent behavior or threats, and that her son would benefit from treatment in a hospital for his mental illness, and needed such treatment as evidenced by behavior creating "a grave and imminent risk to substantial rights of others or himself."
 {¶ 6} On the probate court questionnaire, Hessler's mother reported that her son had a lengthy history of psychiatric treatment, including three prior in-patient hospitalizations beginning in 1983. Collectively, these documents reported that Hessler had recently assaulted his mother and damaged her home, possessed multiple firearms, and stalked a former girlfriend, threatening to kill her and her husband
 {¶ 7} A probate court referee issued a temporary order of detention on May 11, 1995, directing the Franklin County Sheriff to take the patient into custody and "to transport him to the Franklin County Alcohol, Drug Addiction and Mental Health Services Board and/or Columbus Area Mental Health Ctr. and/or Central Ohio Psychiatric Hospital then and there to abide the order of this Court in the premises." The sheriff delivered Hessler to appellee on the evening of May 11, 1995, where an attending physician, Dr. Padma Tandon, evaluated him and admitted him in the early morning hours of May 12.
 {¶ 8} The probate court scheduled a hearing regarding Hessler's involuntary commitment, and appointed counsel to represent him. The court also designated Dr. Robert Turton as a "Court doctor" to conduct an examination of Hessler.
 {¶ 9} During Hessler's admission, appellee's personnel received and reviewed probate court materials regarding the patient, including Craycraft's pre-screen intake and progress reports, reports from a social worker and the CACMHC psychiatrist, photographs of damage the patient caused to his mother's home, and a probate "pickup" form, stating that the patient could present a dangerous situation because he may be in possession of guns.
 {¶ 10} Following Dr. Turton's interview and evaluation of Hessler on May 16, a probate court referee conducted the scheduled hearing on May 17, 1995. The referee found, by clear and convincing evidence, that the patient was "a mentally ill person subject to hospitalization by Court order as defined by Ohio R.C. Sections 5122.01(B)2, 3, 4," for which "the least restrictive alternative available consistent with treatment goals is inpatient hospitalization." The referee issued a judicial entry of commitment ordering the patient "committed for a period not to exceed 90 days" to the Franklin County Alcohol, Drug Addiction and Mental Health Services ("ADAMH") Board with placement with appellee.
 {¶ 11} Hessler remained a patient with appellee almost ten weeks, from May 12, 1995, through July 20, 1995, at which time the hospital discharged him for further outpatient aftercare. During the 69 days Hessler remained under appellee's direct supervision, his hospital treatment team included Dr. Tandon, a psychiatrist, Sharda Mehta, a psychologist, Eydie LeDay-Smith, a social worker, Bryce Sullivan, a group psychotherapist, Dianne Sprague, an activity therapist, and various nursing personnel.
 {¶ 12} During his hospitalization, Hessler's attending psychiatrist reviewed his earlier in-patient record for that hospital, which summarized records for his in-patient psychiatric treatment at two other hospitals. Within the first two weeks of Hessler's admission to appellee, appellee's staff conducted a psychiatric examination, a psychological evaluation, a social work assessment, a nursing assessment and an adjunctive therapy assessment. The staff prepared a treatment plan with a stated goal: "Patient will be able to control the explosive outbursts and will no longer be threatening."
 {¶ 13} The hospital treatment team initially accepted the provisional diagnosis of bipolar disorder, received from CACMHC psychiatrist Dr. Basobas, as a "working diagnosis" until hospital personnel could make their own diagnosis. The hospital's attending psychiatrist subsequently diagnosed Hessler's condition as a delusional mental disease with an intermittent explosive personality disorder.
 {¶ 14} Within a few days of Hessler's admission, the Netcare Agency ("Netcare") acted as the ADAMH Board's duly authorized agent to determine that, following Hessler's discharge from appellee's facility, the North Community Counseling Center (hereafter "The Bridge") would provide this patient's outpatient aftercare with a designated case manager.
 {¶ 15} On May 22, 1995, John Paree, one of The Bridge's social workers, interviewed Hessler and reviewed his records to initiate procedures for the patient's eventual release to The Bridge's outpatient care. The Bridge assigned Lisa Johnson as the agency's case manager for this patient. Johnson first met with Hessler at appellee's facility on June 1, 1995, seven weeks before his discharge. Thereafter, Johnson repeatedly met with this patient, participated in regular meetings with appellee's treatment team, had complete access to Hessler's records, made entries on those hospital records and copied portions of the records for her use in aftercare duties. Johnson was aware of Hessler's violent history and she believed that he was dangerous, expressing fear about her prospective service as his case manager.
 {¶ 16} Appellee's attending psychiatrist, Dr. Tandon, asked The Bridge's case manager to request that Netcare assign this patient to a "community treatment team" for his aftercare services as a means of providing a higher level of case management services. On June 16, 1995, Netcare's evaluator, Ed Plihall, concluded that a traditional aftercare program with a single case manager would meet this patient's community mental health needs after his discharge. Plihall's supervisor, Tom Fuller, reviewed and approved that decision.
 {¶ 17} As part of Hessler's course of treatment under appellee, the treatment team stressed to the patient the importance of taking his medications. He was cooperative in taking the medication, and he assured the treatment team, as well as his prospective aftercare case manager, that he would continue to take his medication following discharge. On June 21, 1995, Hessler began a self-medication program, and he remained on the program until his discharge. A nurse's note, dated July 12, 1995, indicated that the patient was taking his medications properly on the self-medication program. However, based upon his past medical records of non-compliance, and the patient's comments that he did not believe he needed the medication, the treatment team and the prospective aftercare case manager had doubts that he would maintain his medication treatment after discharge without supervision; they anticipated that the patient would likely "decompensate" or renew his mental illness symptoms if he failed to take the prescribed medications, despite the fact he was reportedly non-violent without being on medication for a number of years after he developed his illness.
 {¶ 18} During his hospital stay, the patient became more cooperative with other forms of therapy, and began to talk more about his feelings. On June 17, 1995, a psychologist noted that she was having daily contact with the patient and, on June 28, Hessler agreed to individual counseling twice weekly.
 {¶ 19} The hospital's attending psychiatrist tentatively planned to discharge the patient on July 12, 1995, but the discharge was delayed to allow further post-discharge arrangements. The Bridge's aftercare case manager, Johnson, disagreed with a discharge date of July 12 because the patient displayed non-violent anger after the attending psychiatrist told the patient she would be delaying his discharge.
 {¶ 20} On July 12, 1995, the attending psychiatrist believed that the patient was no longer a "mentally ill person subject to hospitalization by court order," as defined under R.C. 5122.02(B); thus, appellee accepted the patient's voluntary admission there in lieu of his involuntary admission.
 {¶ 21} The change of the patient's status from an involuntary admission to a voluntary admission required the probate court to dismiss its case and terminate its commitment order. On July 20, 1995, appellee discharged Hessler for follow-up supervision and aftercare by The Bridge. All members of the treatment team agreed with the decision to discharge him on July 20, 1995.
 {¶ 22} At the time of Hessler's discharge, appellee had a detailed discharge and aftercare plan, which it implemented and communicated to the assigned aftercare case manager. Furthermore, the patient had a job, an acceptable place to reside, suitable transportation and a supportive family.
 {¶ 23} Following the patient's discharge from appellee's facility, The Bridge assumed Hessler's outpatient care. That aftercare agency possessed the capability to provide case management, psychiatric evaluation and care, medication monitoring, community outreach, psychotherapy, and crisis intervention.
 {¶ 24} On August 25, 1995, The Bridge's psychiatrist, Dr. Robert Pugliese, examined Hessler and evaluated his mental health needs. Neither The Bridge's psychiatrist nor its case manager concluded that there was any reason to seek a recommitment order from the probate court. On October 19, 1995, Hessler ordered a handgun at a local gun store. On October 23, 1995, The Bridge's case manager discussed her lack of patient contact with Dr. Pugliese, who told her that the patient needed to meet with her regularly and to take the prescribed medications. On October 30, The Bridge's case manager telephoned the patient and told him that he needed to see the agency's psychiatrist, Dr. Pugliese.
 {¶ 25} Hessler came to see the case manager on October 31, and Johnson scheduled an appointment for him with the psychiatrist for November 10. At the time of the October 31 visit, The Bridge's case manager believed Hessler appeared normal and non-dangerous, and he picked up some medications that had been awaiting him at The Bridge's own pharmacy. When Hessler failed to appear for his previously scheduled November 10 visit with The Bridge's psychiatrist, the case manager made no effort to contact him. On November 14, 1995, Hessler's sister-in-law, Cynthia Hessler, called Bank One, where the husband of one of Hessler's former girlfriends was employed. She reported her concern about his increasingly alarming and threatening behavior toward that employee. On November 19, 1995, Hessler came to his mother's home wearing combat apparel; he then drove his car to several locations where he killed four people and wounded and terrified others.
 {¶ 26} Based upon the evidence presented, the Court of Claims concluded that, appellants failed to prove, by a preponderance of the evidence, that appellee was negligent in a manner that proximately caused their injuries or damages. The court found that The Bridge was a fully informed and consciously acting agency, whose negligent conduct appellee had no reason to anticipate and could not have reasonably foreseen, and that The Bridge's negligence was a superceding intervening cause that prevented any conduct by appellee from being a proximate cause of any of appellants' injuries or damages. The court further found that appellee and its personnel acted in good faith, relying on actual knowledge or information they thought to be reliable, when they participated in and assisted in the patient's hospitalization and discharge. Thus, the court found appellee and its staff to be statutorily immune from liability, pursuant to R.C. 5122.34, for their actions and decisions regarding this patient's discharge.
 {¶ 27} On appeal, appellants set forth the following 16 assignments of error for review:
I. The Trial Court erred in concluding that Plaintiffs failed to meet their burden of proving that COPH had a duty or ability to insist on community treatment team placement for Jerry Hessler.
II. The Trial Court erred in finding that the COPH treatment team adequately assessed Jerry Hessler's risk of violence pursuant to the applicable standards of care.
III. The Trial Court erred in finding that COPH personnel made appropriate arrangements to reduce risk provoking factors upon Jerry Hessler's discharge.
IV. The Trial Court erred in finding that Jerry Hessler was clinically stable and no longer imminently dangerous by July 12, 1995.
V. The Trial Court erred in finding that there was no evidence to indicate that the Probate Judge or Referee would make the necessary findings in order to extend Jerry Hessler's involuntary commitment beyond August 15, 1995, or deny his request for discharge as a voluntary patient on or after July 12, 1995.
VI. The Trial Court erred in finding that on the date of Jerry Hessler's discharge, July 20, 1995, his mental illness was in remission, he was regularly taking his prescribed medications, was less threatening and was non-violent.
VII. The Trial Court erred in concluding that Plaintiffs failed to meet their burden of proving that the COPH treatment team acted negligently in discharging Jerry Hessler, in implementing an appropriate discharge plan, or in providing the Bridge with the appropriate information.
VIII. The Trial Court erred in concluding that Plaintiffs failed to meet their burden of proving that the COPH treatment team's conduct proximately caused Jerry Hessler's violent acts on November 19, 1995.
IX. The Lower Court erred in concluding that Plaintiffs failed to meet their burden of proving that the COPH treatment team acted negligently in failing to release Jerry Hessler on a trial visit rather than discharging him outright.
X. The Trial Court erred in concluding that Plaintiffs failed to meet their burden of proving that, had Jerry Hessler been released on a trial visit rather than discharged outright, his violent acts of November 19, 1995 would have been prevented.
XI. The Trial Court erred in concluding that Plaintiffs failed to meet their burden of proving that the COPH treatment team should have requested that the Bridge provide a different aftercare case manager, and that its failure to do so proximately caused Jerry Hessler's later violent acts.
XII. The Trial Court erred in finding that no one at COPH had any knowledge of Jerry Hessler's condition after August 18, 1995.[1]
XIII. The Trial Court erred in concluding that Plaintiffs failed to meet their burden of proving that COPH was negligent in any manner that proximately caused Plaintiffs' injuries or damages.
XIV. The Trial Court erred in concluding that the Bridge's negligent conduct was a superceding intervening cause which prevented any conduct by COPH from being a proximate cause of any of Plaintiffs' injuries or damages.
XV. The Trial Court erred in concluding that the COPH treatment team acted in good faith in assessing, treating, and discharging Jerry Hessler.
XVI. The Trial Court erred in concluding that COPH and its personnel are immune from liability for their actions and decisions regarding Jerry Hessler's care and discharge.
 {¶ 28} We initially note that, although not styled as such in appellants' brief, many of the arguments raised under the various assignments of error essentially challenge the trial court's findings as against the manifest weight of the evidence. Under Ohio law, a reviewing court will not reverse a judgment of the trial court as being against the manifest weight of the evidence if such judgment is supported by some competent, credible evidence going to all the essential elements of the case. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. Further, "a reviewing court must be guided by the presumption that the findings of the trial court are correct, as the trial judge is best able to view the witnesses, observe their demeanor, gestures, voice inflections, and use these observations in weighing the credibility of the proffered testimony." Whiting v. Ohio Dept. of Mental Health (2001),141 Ohio App.3d 198, 202.
 {¶ 29} The evidence in this case was voluminous, much of it in the form of expert testimony. Appellants' expert witnesses included James Reardon, Ph.D., Jeffrey Smalldon, Ph.D., and James Beck, M.D., Ph.D., while appellee's expert witnesses included Gordon Neligh, M.D., Robert Sadoff, M.D., John Monahan, Ph.D., and Janet Warren, DSW. Further, some of the testimony was in the form of depositions introduced into evidence.
 {¶ 30} In general, in order to maintain a wrongful death action on a theory of negligence, a plaintiff must show: (1) the existence of a duty owed to plaintiff's decedent; (2) a breach of that duty; and (3) that the breach proximately caused death. Littleton v. Good SamaritanHosp. Health Ctr. (1988), 39 Ohio St.3d 86, 92. In Littleton,
supra, at 99, the Ohio Supreme Court adopted the "professional judgment rule" in considering the potential liability of a psychiatrist for the violent acts of a voluntarily hospitalized patient following the patient's discharge, holding in relevant part:
Where there are professional standards of care a psychiatrist is required to conform to the standards at all times or suffer liability. Where there are no professional standards, a psychiatrist must exercise good faith judgment based on a thorough evaluation of all relevant factors. Professional standards will be used to determine which factors are relevant and whether an evaluation was thorough.
Therefore, we hold that a psychiatrist will not be held liable for the violent acts of a voluntarily hospitalized mental patient subsequent to the patient's discharge if (1) the patient did not manifest violent propensities while being hospitalized and there was no reason to suspect the patient would become violent after discharge, or (2) a thorough evaluation of the patient's propensity for violence was conducted, taking into account all relevant factors, and a good faith decision was made by the psychiatrist that the patient had no violent propensity, or (3) the patient was diagnosed as having violent propensities and, after a thorough evaluation of the severity of the propensities and a balancing of the patient's interests and the interests of potential victims, a treatment plan was formulated in good faith which included discharge of the patient.
 {¶ 31} Under the professional judgment rule, a psychiatrist is not required to assume the risk of improper treatment; rather, "`[u]nder the rule, "grounds [for liability], including premature discharge and failure to warn, can be a basis for liability only in the absence of good faith or a failure to exercise professional judgment."'" Jenks v. WestCarrollton (1989), 58 Ohio App.3d 33, 38, quoting Littleton, supra, at 100. Further, "[t]he professional judgment rule does not impose additional or more substantial duties of care on a psychiatrist or similar health care provider against whom a negligence claim is made by a third party for injuries inflicted by a patient," but, instead, the rule "provides additional defenses where there is no discernible standard of reasonable care the provider must meet." Jenks, supra, at 38.
 {¶ 32} As noted under the facts, Hessler was initially committed involuntarily to appellee pursuant to Ohio's commitment statutes. R.C.5122.01(B) states in pertinent part:
"Mentally ill person subject to hospitalization by court order" means a mentally ill person who, because of the persons illness:
* * *
(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;
* * *
(4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself.
 {¶ 33} Pursuant to R.C. 5122.15(C), the initial commitment of an individual to a hospital, based upon a finding that such person is a mentally ill person, may not exceed 90 days. R.C. 5122.15(H) requires that a person who is originally committed for 90 days must be discharged at the end of that period unless, at least ten days before the expiration of the period, the attorney general or another authority has applied for continued commitment.In re Kuehne (July 6, 1999), Butler App. No. CA98-09-192. A trial court, upon a finding that a person is subject to hospitalization, must determine the "least restrictive place of confinement in consideration of the patient's diagnosis and prognosis, preference of the patient and the projected treatment plan." State v.Williams (Dec. 21, 1999), Mahoning App. No. 98-CA-1, citing R.C.5122.15(E). Ohio's statutory scheme also provides for the voluntary hospitalization of individuals. See R.C. 5122.02.
 {¶ 34} In the instant case, in addition to finding that appellee was not negligent in a manner that proximately caused injuries to appellants, the court also found that appellee was entitled to immunity pursuant to R.C. 5122.34(A), which states as follows:
Persons, including, but not limited to, boards of alcohol, drug addition, and mental health services and community mental health agencies, acting in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assist in the hospitalization or discharge, determination of appropriate placement, or in judicial proceedings of a person under this chapter, do not come within any criminal provisions, and are free from any liability to the person hospitalized or to any other person.
 {¶ 35} In considering the issue of "good faith," relevant factors include:
"* * * [T]he competence and training of the reviewing psychotherapists, whether the relevant documents and evidence were adequately, promptly and independently reviewed, whether the advice or opinion of another therapist was obtained, whether the evaluation was made in light of the proper legal standards for commitment, and whether other evidence of good faith exists."
Littleton, supra, at 96, quoting Currie v. United States (M.D.N.C. 1986), 644 F. Supp. 1074, affirmed on different grounds (C.A. 4, 1987),836 F.2d 209.
 {¶ 36} Under the first assignment of error, appellants assert that the trial court erred in concluding that appellants failed to meet their burden of proving that appellee had a duty or ability to insist upon community treatment team placement for Hessler.
 {¶ 37} We note that, while appellants allude to the question of whether appellee should have discharged the patient on a trial visit basis, an issue specifically raised under their ninth and tenth assignments of error, we construe the first assignment of error as challenging the trial court's finding of fact No. 31, in which the court held that "plaintiffs failed to show by a preponderance of the evidence that the hospital had the duty or ability to insist on any aftercare placement or treatment, or that it would have ultimately prevailed if it had any such duty and right."
 {¶ 38} By way of background, appellants argued at trial that, under the Unified Services Agreement, entered between appellee, the county ADAMH Board, and various other agencies, appellee had the right to insist that Hessler receive aftercare by a community treatment team. Appellants contend that the chance of Hessler having a successful discharge could have been bolstered if he had been released into the care of a community treatment team, as appellants' expert testified should have been done, rather than simply releasing Hessler to a case manager with whom he could interact whenever he desired.
 {¶ 39} As noted under the facts, the Court of Claims found that appellee's attending physician, Dr. Tandon, asked The Bridge's case manager, Lisa Johnson, to request that Netcare assign Hessler to a community treatment team for his aftercare services, thereby providing for a higher level of case management services. However, in response to this request, Netcare's evaluator, Ed Plihall, determined on June 16, 1995, that a traditional aftercare program with a single case manager would meet this patient's community mental health needs following his discharge. Tom Fuller, Plihall's supervisor, reviewed and approved that decision. The Court of Claims found that appellee satisfied its duty regarding the attending physician's preference for aftercare by a community treatment team when the physician asked The Bridge's aftercare case manager to request Netcare's reconsideration on this issue.
 {¶ 40} In its decision, the Court of Claims also discussed the provisions of the Unified Services Agreement, noting that nine agencies, the Ohio Department of Mental Health, the county ADAMH Board, appellee, Netcare, CACMHC, and four other outpatient treatment facilities, approved the agreement. The Unified Services Agreement at issue provides for a "Procedural Dispute Process," which states in part:[2]
3.10.1.1 The [ADAMH] Board designee [Netcare] and the Hospital's Managed Care Director [Jeffrey Hill] will initially communicate with each other to attempt to resolve the dispute.
3.10.1.2 If resolution is not achieved, the matter will be referred to the Chief Executive Officer of the Hospital and the Director of the [ADAMH] Board.
3.10.1.3 In the event that a dispute is not resolved pursuant to the above, the disputed matter will be considered by an independent party who will render an opinion within three (3) working days.
3.10.1.4 The independent party selected to consider the dispute will be mutually agreeable to the Hospital and Board. * * * The Board and Hospital will not be bound by the opinion rendered by the independent party. The Board and the Hospital agree to attempt again to resolve the dispute and to consider the opinion rendered by the independent party. Ifan agreement cannot be reached, the final decision shall be made by theHospital CEO for matters concerning hospital operations, and by the BoardExecutive Director for matters concerning community based programming. * * *
 {¶ 41} The Unified Services Agreement contains a "Clinical and Discharge Plan Dispute Process," stating in part:
3.10.2.1 The [ADAMH] Board CCO or designee and the Hospital attending physician [Dr. Tandon] will initially communicate with each other to attempt to resolve the dispute. * * *
3.10.2.2 If resolution is not achieved the Hospital CCO and [ADAMH] Board CCO or designee will attempt to resolve the matter within three (3) working days.
3.10.2.3 If the Hospital CCO and Board CCO or designee disagree over any treatment aspect of a resident both parties agree to seek consultation of a third party that is chosen from a mutually acceptable pool. * * * If disagreement remains, the Hospital CCOor designee will make the final decision.
3.10.2.4 The Hospital acknowledges the right of the [ADAMH] Board to grieve to the ODMH [Ohio Department of Mental Health] any matter disputed under this Section.
 {¶ 42} Finally, Section 8 of Appendix A to the Unified Services Agreement provides in part, regarding the "Discharge Process," that:
8.1.1.1 All parties further agree to recognize and abide by the discharge criteria, date, and plan written on the Hospital treatment plan.
8.1.1.2 If any party to this agreement disagrees with the discharge criteria, date, and/or the discharge plan, the responsible parties agree to confer and attempt to resolve the differences. If agreement cannot be reached, the matter will be resolved pursuant to the dispute resolution process outlined in section 3.10 of this Agreement.
 {¶ 43} In construing the language of the agreement, the Court of Claims found that the "overall import of the United [sic] Services Agreement clearly gives the ADAMH Board paramount authority and responsibility for mental patient care, subject to the hospital's authority and responsibility for in-patient care of hospital residents." The court further held:
Reading the document in its entirety, this court finds that it unambiguously provides that (a) the hospital has primary authority over decisions regarding in-patient care for its residents; (b) the ADAMH Board has primary authority over a patient's assignment for community-based aftercare; (c) the agency to which the ADAMH Board assigns a patient's community-based aftercare has primary authority over decisions regarding out-patient aftercare treatment; (d) the ADAMH Board or its designees can challenge any hospital's or agency's treatment decisions; (e) if the ADAMH Board and the hospital cannot resolve their disagreement with mediation assistance, the hospital retains control over in-patient treatment decisions, subject to the ADAMH Board's right to appeal to the ODMH; (f) if the ADAMH Board and the aftercare agency cannot resolve their disagreement with mediation assistance, the aftercare agency may have no comparable right to appeal to the ODMH.
 {¶ 44} The Court of Claims determined that, in light of the probate court's commitment of this patient to the ADAMH Board with placement with appellee, "[i]t is doubtful that the agreement between the ADAMH Board and the hospital contravenes or supercedes the controlling court order, which gave the ADAMH Board the authority for the patient's placement and relocation," as well as the "responsibility to `place the respondent [patient] in the least restrictive environment available consistent with treatment goals.'" The court further found that, even if appellee should have challenged Netcare's placement, there was no reliable evidence showing how the ADAMH Board would have responded to that complaint, or "whether a reasonable hospital would have refused to accept the ADAMH Board's ultimate decision about this patient's aftercare placement." Rather, the court found that appellee and the ADAMH Board "both relied on Netcare for any aftercare decision because Netcare was presumably better equipped to make that decision, particularly when it both considered and reconsidered the patient's aftercare placement."
 {¶ 45} We note that appellants do not specifically challenge the trial court's interpretation of the Unified Services Agreement, except to assert generally that the agreement gave appellee the ability to determine aftercare. The record in this case supports the trial court's finding that, while Dr. Tandon recommended community team placement for Hessler, Netcare made the decision to deny a community treatment team for Hessler. Specifically, in 1995, the ADAMH Board and Netcare had a contractual relationship, whereby Netcare performed community assessment program ("CAP") services. Following Dr. Tandon's recommendation, The Bridge's caseworker, Johnson, contacted Tom Fuller, Netcare's CAP director, and requested that Netcare re-evaluate Hessler for community treatment team services. Netcare employee Plihall, who performed CAP assessments and had the option of referring an individual to a treatment team or to more traditional aftercare services, assessed Hessler and decided not to assign him to a community treatment team. Fuller testified that he supported Plihall's decision not to assign a treatment team to Hessler, stating that, at the time of that decision, he "felt that [Hessler's] functioning level was rather high compared to the other mentally ill people that we assessed." (Tr. 2919.)
 {¶ 46} Further, we find no error with the Court of Claims' determination that the evidence did not prove that a reasonable hospital was required to challenge the agency's determination, or that such a challenge would have likely been successful. Appellee's expert, Dr. Neligh, testified that, despite Dr. Tandon's awareness that this recommendation would not be followed, it would have been unusual for Dr. Tandon to attempt to override the opinions of individuals designated as experts in that field, noting that appellee and its staff did not have the expertise, facilities or knowledge regarding community treatment team resources. He further testified that appellee's treating physician, Dr. Tandon, had reason to expect that Hessler would receive standard aftercare treatment. Dr. Neligh opined that the physician acted in accordance with the standard of care, and that appellee's conduct was not below the standard of care in failing to appeal or challenge the Netcare decision to deny community team treatment. We also note there was evidence before the court that The Bridge itself had the ability to assign the patient to community team treatment, had it deemed such an assignment appropriate.
 {¶ 47} Here, the record supports the Court of Claims' finding that the ADAMH Board and appellee relied upon Netcare to determine whether the patient would be better served by a community treatment team or more traditional aftercare, and we find no error with the court's determination that appellants failed to prove appellee had the duty or ability to insist on a community treatment team, or that it would have been successful if it possessed such a duty and right. Accordingly, appellants' first assignment of error is overruled.
 {¶ 48} Appellants' second and third assignments of error are interrelated and will be considered together. Under these assignments of error, appellants argue that the trial court erred in finding that appellee's treatment team adequately assessed Hessler's risk of violence under the applicable standards of care, and that the court erred in finding that appellee's personnel made appropriate arrangements to reduce risk provoking factors upon the patient's discharge.
 {¶ 49} Regarding appellee's assessment of the patient's risk of violence, the trial court found that, during Hessler's hospitalization, appellee's personnel "adequately assessed his risk of violence according to standards of care applicable then, which did not rely on any formal risk assessment checklist but depended upon clinical interviews with knowledge of his violent history." The court further found that, prior to Hessler's discharge, appellee's personnel made appropriate arrangements to reduce the patient's risk provoking factors by: "(a) directing the Bridge's aftercare case manager to provide designated medication, and psychiatric and psychological care; (b) confirming his employment immediately after his discharge; (c) confirming his housing away from his previously contentious home environment; and (d) confirming that all weapons had been removed from his home."
 {¶ 50} At trial, appellants' expert, Dr. Smalldon, testified that appellee should have performed a structured risk assessment prior to discharging Hessler, and that the failure to do so fell below the standard of care. Dr. Smalldon referred during his testimony to "the importance of a systematic, structured inquiry into a range of variables" deemed "important to consider in developing estimates of risk." (Tr. 751.)
 {¶ 51} In support of their contention that the trial court erred in finding that appellee adequately assessed the patient's risk of violence, appellants cite the following testimony by appellants' expert, Dr. James Beck, who, during direct examination, was questioned about the extent to which Hessler improved during his stay with appellee:
I think he improved slightly, a little bit, not a lot. I think that his improvement was due entirely to the fact that he was taking the antipsychotic medication and other medications that were prescribed for him. And I think that the improvement would — that there was no evidence that he had improved at all in his understanding of his mental illness, in his acceptance of treatment, in his alliance with his treaters or voluntary compliance with treatment. And it's clear on the record that he was not — the very substantial likelihood he would stop taking his medicine when he was discharged. And, again, clear on the record that when he was not taking his medicine, that he was a dangerous patient. And for that reason, he was a present danger when they discharged him.
(Tr. 1290.)
 {¶ 52} The expert testimony on this issue was conflicting. Appellee's expert, Dr. Monahan, a licensed psychologist, stated that, in 1995, historic clinical and risk management factors, first published in late 1995, were not in widespread clinical use. Dr. Monahan opined that there would be no violation of the standard of care if a facility discharged a patient without performing a structured formal risk assessment. Rather, Dr. Monahan testified that the standard of care in 1995 involved a clinical interview to ascertain whether the patient possessed factors known to be risk factors for violent behavior, including the patient's past history of violence, whether substance abuse was involved, and the individual's history of controlling his anger. He stated that a number of studies suggested that clinical risk assessment was highly inaccurate, and that, in 1995, there was no method by which a clinician could predict, with greater than a 50 percent probability of accuracy, whether a patient would become violent in the future. He testified that there were also no psychological tests that had been found to be particularly useful in predicting violence in 1995.
 {¶ 53} Based upon his review of the 1995 records of Hessler's admission with appellee, Dr. Monahan opined that the staff met the standard of care in assessing the patient's violent risk assessment. He believed that the staff accurately assessed Hessler as presenting a high risk of violence to others at the time of his admission, and that appellee complied with national standards of care in their treatment of Hessler as a patient involuntarily committed for violent acts. He stated that adherence to psychotropic medication can be very effective in reducing the symptoms of many physical disorders; further, appellee repeatedly attempted to engage Hessler in psychological treatment over the course of a hospitalization that was approximately three times longer than the average length of stay and, by attempting psychological treatments and observing him adhere to medical treatments, COPH treated him in accordance with the national standard of care.
 {¶ 54} Dr. Warren similarly testified that, in 1995, there were no structured risk assessment instruments commonly in use. She stated that such tools first began to appear in literature in 1996 and 1997. Dr. Warren opined that appellee's treatment team met the applicable standard in 1995 in assessing Hessler's potential risk for violence. According to this witness, the treatment team "did a thorough assessment, were able to identify both static risk factors, dynamic risk factors, and developed an intervention plan that addressed all of the available dynamic factors in a way that was thorough and appropriate." (Tr. 2748.)
 {¶ 55} Dr. Warren also testified that appellee properly addressed those risk factors, including: establishing an optimal medication regimen; educating the patient on his need to take medication and verifying from the patient that he would continue to take his medicine; referring the patient to aftercare, with the assumption the aftercare provider would follow-up with monitoring medication compliance; confirming the patient had employment following discharge; ensuring the patient had housing that was, as noted by the Court of Claims, away from his previously contentious home environment; and making efforts to ensure that any weapons or problematic substances had been removed from his home.
 {¶ 56} A review of Dr. Smalldon's testimony on the need for a structured risk assessment indicates that, on cross-examination, Dr. Smalldon gave a "qualified yes," in response to whether there was a lack of standards in 1994 to guide clinicians in making such risk assessments. Appellee argues that appellants fail to cite other portions of Dr. Beck's testimony that undercut the argument that Hessler was dangerous at the time of his release. Specifically, Dr. Beck also stated during his testimony that Hessler was stable at the time of discharge, and when asked whether Hessler improved while with appellee, Dr. Beck responded, "Yes." (Tr. 1289.) Moreover, during cross-examination, Dr. Beck agreed with counsel for appellee that, at the time of discharge, Hessler was not "imminently dangerous" to anyone.
 {¶ 57} Based upon the evidence presented, we find that there was competent, credible evidence to support the Court of Claims' findings that appellee adequately assessed the patient's risk of violence according to applicable standards of care, and that appellee's personnel made appropriate arrangements to reduce risk provoking factors prior to discharge. Accordingly, appellants' second and third assignments of error are not well-taken and are overruled.
 {¶ 58} Appellants' fourth, fifth and sixth assignments of error are interrelated and will be considered together. Under these assignments of error, appellants argue that the trial court erred in finding: Hessler was clinically stable and no longer imminently dangerous by July 12, 1995; there was no evidence to indicate that the probate judge or a referee would have made findings to extend Hessler's involuntary commitment beyond August 15, 1995, or to deny his request for discharge as a voluntary patient on or after July 12, 1995; and that Hessler's mental illness was in remission on the date of discharge.
 {¶ 59} In support of their argument that the trial court erred in finding that the patient was stable upon release, appellants again cite that portion of Dr. Beck's testimony in which he stated that Hessler was a "present danger" when he was discharged. (Tr. 1290.) As previously noted, however, Dr. Beck gave differing testimony on this issue, as he also stated that Hessler was "stable" and not "imminently dangerous" at the time of discharge. Appellants also cite to a passage of the testimony of Dr. Monahan, but a review of that part of the record does not support appellants' claim that appellee's treatment team knew that Hessler posed a substantial risk of physical harm to others at the time of his release. Rather, Dr. Monahan was merely responding to a general question as to whether he would endorse discharging a patient that is unstable or prone to violence. Further, as noted by appellee, Dr. Monahan stated during his testimony that Hessler was unstable while on medication with appellee "[e]arly in the hospitalization, not late in the hospitalization." (Tr. 2235.)
 {¶ 60} On this issue, Dr. Neligh, testified that, at the time of Hessler's discharge on July 20, 1995, "there was no evidence of present or imminent dangerousness." (Tr. 3048.) Specifically, the factors that led to the decision to initially probate the patient had been resolved. Dr. Neligh opined that, in accordance with the standard of care in 1995, appellee's staff appropriately assessed Hessler's violence propensities. Dr. Monahan also testified that, at the time of discharge, Hessler did not evidence present dangerousness.
 {¶ 61} Dr. Neligh addressed the issue of risk of non-compliance by the patient. The expert noted that appellee was aware that the patient might not be compliant, but that appellee's staff addressed that in a variety of ways, including the decision to provide the patient a transition period of self-medication and to monitor that program prior to his discharge. Dr. Monahan acknowledged that Hessler was at risk of non-compliance, and that appellee knew there was a possibility that Hessler would be non-compliant. He testified, however, that appellee did not have reason to know that Hessler was not going to take his medication.
 {¶ 62} Upon review, we find there was competent, credible evidence to support the Courts of Claims' finding that Hessler was clinically stable and no longer imminently dangerous by July 12, 1995.
 {¶ 63} Appellants also challenge the Court of Claims' finding that there was no evidence suggesting that a probate court would probably have issued an order that would have extended the patient's involuntary commitment period beyond August 15, 1995, or denied any request the patient may have made for his discharge as a voluntary patient on or after July 12, 1995. Appellants maintain that the trial court appears to have been requiring appellants to procure an advisory opinion from the probate court and to introduce it at trial. We do not construe the trial court's decision as imposing such a requirement; rather, read in context, we find that the court was merely responding to appellants' contention at trial that, at the time of discharge, Hessler still met the requirements for hospitalization as a "mentally ill person subject to hospitalization" pursuant to R.C. 5122.01. Thus, we find no error as to this determination.
 {¶ 64} Finally, appellants argue that the Court of Claims erred in its findings regarding Hessler's condition on July 20, 1995, the date of his discharge. Specifically, appellants challenge the following findings by the court:
On Thursday, July 20, 1995, the defendant hospital discharged this patient for follow-up supervision and aftercare by the Bridge. At that time, his mental illness was in remission, and he was regularly taking the prescribed medications. In the earlier part of his hospitalization, he had been angry, threatening, moody, and unresponsive. He became more open in group therapy, less threatening, and he was nonviolent for his entire ten-week stay. His relationship with his mother improved. She had a pleasant visit with him at the hospital, where he allowed her to hug him. He made no attempt to leave the hospital without permission, and he returned from absences with leave at or near the time he was due back. All members of his hospital treatment team agreed with the decision to discharge him on July 20, 1995.
 {¶ 65} The above findings by the trial court are supported by competent, credible evidence in the record, as numerous witnesses testified that Hessler's condition improved during his more than nine-week stay with appellee. Dr. Monahan testified, "there was clear and significant improvement in his clinical condition over the course of hospitalization." (Tr. 2026.) According to Dr. Monahan, Hessler's condition stabilized, his psychosis was in remission at the time of discharge, the patient presented no violent ideation, and he was compliant with medication. The patient also verbalized his intention to adhere to treatment in the community following discharge.
 {¶ 66} According to Dr. Neligh, at the time of Hessler's discharge, there was no evidence of present or imminent dangerousness with the patient. Rather, the patient was stabilized, and his acute dangerousness had been addressed.
 {¶ 67} Dr. Sadoff noted a change in clinical condition of the patient. Whereas the patient had previously been angry, threatening and moody, he became more open in group therapy, was non-threatening, complied with taking his medication, and "continued to be nonviolent for the whole nine weeks that he was there." (Tr. 2356.) He further noted that Hessler showed "significant changes in his behavior and his attitude towards the staff," and "proved that he could handle periods of time out of the hospital before discharge." (Tr. 2361.) Dr. Sadoff opined that, "at the time of discharge Mr. Hessler had improved, had stabilized in his mood," and "did not present as an imminent threat of harm to self or others." (Tr. 2359.)
 {¶ 68} Dr. Warren similarly testified that, at discharge, appellee's staff had met their treatment goals, that the patient had become stabilized, and appellee had implemented a reasonable aftercare program in collaboration with The Bridge and the case manager. Dr. Warren did not believe that there was "anything more that could have been accomplished on an inpatient basis" prior to Hessler's discharge. (Tr. 2759.)
 {¶ 69} We find the above testimony to be competent, credible evidence to support the Court of Claims' findings regarding the patient's condition on the date of his discharge.
 {¶ 70} Based upon the foregoing, appellants' fourth, fifth and sixth assignments of error are not well taken and are overruled.
 {¶ 71} We will next address appellants' ninth and tenth assignments of error, which are interrelated. Under the ninth assignment of error, appellants maintain that appellee was negligent in failing to release Hessler on a trial visit, rather than discharging him outright. Under the tenth assignment of error, appellants assert that the trial court erred in concluding that appellants failed to meet their burden of proving that, had Hessler been released on a trial visit as opposed to being discharged, his subsequent violent acts of November 19, 1995 would have been prevented.
 {¶ 72} In support of their arguments pertaining to the issue of trial visits, appellants rely upon R.C. 5122.22, which provides in part:
When the chief clinical officer of a hospital considers it in the best interest of a patient, the officer may permit the patient to leave the hospital on a trial visit. The trial visit shall be for the period of time the chief clinical officer determines, but shall not exceed ninety days, unless extended for subsequent periods not to exceed ninety days after evaluation of the patient's condition.
 {¶ 73} Appellants maintain that, pursuant to the above statutory provision, appellee had the ability to release Hessler on a trial visit basis. Appellants' expert, Dr. Reardon, testified that, while he did not believe Hessler should have been discharged on July 20, 1995, had he been part of a treatment team planning for discharge he would have recommended that the patient be "released in a trial visit-type situation involving community monitoring with a community treatment team." (Tr. 1607.) One of appellee's contentions at trial, however, was that trial visits were not widely used by mental health providers in 1995. On cross-examination, Dr. Reardon testified that, he first became aware of the provision under R.C. 5122.22 regarding trial visits in 2001, and that he only had one previous experience in which he had recommended that a patient be released on a trial visit. One of appellants' other experts, Dr. Smalldon, when asked by appellants' counsel whether he was familiar with the concept of a trial visit, stated, "I don't believe I had ever heard of it before I was informed of that particular statute, but I'm certainly aware of it now." (Tr. 676.)
 {¶ 74} Appellee's expert, Dr. Monahan, opined that it was appropriate for appellee, when Hessler no longer qualified for inpatient commitment, to transfer clinical responsibility to The Bridge for outpatient treatment instead of releasing him on a trial visit. According to Dr. Monahan, "the practice in Ohio is that procedures like this were rarely invoked." (Tr. 2045.) Jeffrey Hill, a licensed independent social worker, testified that trial visits have not been used for years due to the development of community mental health centers. Prior to that time, when a mental hospital was responsible for both inpatient and outpatient care, a trial visit was a means of providing for patients to "be out of the hospital up to a year, with the idea that they would then come back to the hospital, see how they were doing, and possibly at that point be discharged." (Tr. 1845.) Hill stated that the current practice is to use absences with leave as opposed to trial visits.
 {¶ 75} Dr. Neligh gave the following response as to whether discharging Hessler on a trial visit would have been within the standard of care in 1995:
It would have been highly unusual, if not unthinkable. I believe that looked like a holdover from the days of transition from the state hospitals being the flagships of the system to the community. And I know of some state hospitals that, in the 1960s, did have trial visits. And in those days, either the chief medical officer or the superintendent had some sort of responsibility, both under law and under ethics, to see how the person was doing in the community. And they could theoretically revoke that trial visit status and bring them to the hospital without a hearing.
To my knowledge, there's nowhere in the country that does that, and I don't think they could.
(Tr. 3077.) Dr. Neligh further stated that, "the general belief is that the trial visit system is impracticable because the state hospital has no ability to go out and monitor how someone is doing on a trial visit." (Tr. 3154.)
 {¶ 76} The Court of Claims, in holding that appellants failed to prove, by a preponderance of the evidence, that appellee acted negligently by discharging the patient instead of releasing him for a statutory trial visit, noted testimony that Ohio's trial visit statute "was probably a vestige of long-abandoned procedures in which in-patient psychiatric hospitals retained involuntary patients indefinitely." The court found that, although appellants' expert witnesses expressed a preference for a trial visit, those witnesses failed to explain when or how appellee would have implemented the procedure for this patient. The court further noted that, absent a probate court order, the ADAMH Board and appellee would have lost authority to maintain involuntary control over the patient by August 15, 1995, and the court concluded that there was no evidence to show "whether a trial visit until August 15 would have prevented the patient's violent acts more than three months later."
 {¶ 77} We find no error with the court's determination that appellants failed to prove that appellee acted negligently in failing to utilize a statutory trial visit. The evidence presented failed to show that the standard of care in 1995 required that appellee release patients on trial visits. Rather, the testimony supported the court's finding that this method of treatment was not generally utilized within the medical community in 1995, and appellee's experts cast substantial doubt on the issue of whether the standard of care required such action. Moreover, as noted by the court, appellants' witnesses never explained how appellee would have implemented such a procedure for this patient, or what the likely outcome would have been. Finally, despite overwhelming testimony to the contrary, even assuming that statutory trial visits had been regularly employed in 1995, where alternative methods of treatment can be used, "the selection of one method over the other is not in and of itself negligence." Pesek v. Univ. Neurologists Assn., Inc. (2000),87 Ohio St.3d 495, 498, citing Clark v. Doe (1997), 119 Ohio App.3d 296,302 (approving jury instruction informing jury that a doctor "cannot be held liable simply for his selection of a different procedure than another doctor might have used"). The issue, as discussed more fully, infra, is whether the method of treatment chosen was done in accordance with the applicable standard of care.
 {¶ 78} Based upon the foregoing, appellants' ninth and tenth assignments of error are not well taken and are overruled.
 {¶ 79} Appellants' seventh, eighth, eleventh, thirteenth, fifteenth and sixteenth[3] assignments of error will be addressed together. These assignments of error raise various challenges to the trial court's findings that appellants failed to prove that appellee acted negligently in its treatment and decision to discharge Hessler, and that appellee was entitled to immunity pursuant to R.C. 5122.34.
 {¶ 80} Under the seventh assignment of error, appellants argue that the evidence shows appellee did not conduct a careful or thorough evaluation of Hessler's propensity for violence, including appellee's failure to: review his prior medical records, consult with prior physicians, and contact family members regarding the patient's psychiatric history; discover the patient's history of physical or sexual abuse; discover, communicate or understand the significance of the patient's history of stalking; conduct a thorough neurological evaluation to rule out organicity as a cause of Hessler's mental illness; discover past and current abuse of amphetamines and caffeine pills; and engage Hessler in any meaningful way in psychotherapy or otherwise address the cause of his violent behavior. For the reasons stated below, we find no error by the trial court as to the issues raised under the seventh assignment of error.
 {¶ 81} In arguing that appellee failed to properly review the patient's prior medical records, consult with his prior physicians, and contact his family members regarding the patient's psychiatric history, appellants cite portions of the testimony of psychologist Mehta, social worker LeDay-Smith and Dr. Monahan. For instance, during the cross-examination of Mehta, who was part of the treatment team, this witness stated that, at the time of the patient's admission, she did not have Hessler's prior medical records. However, while Mehta acknowledged that she did not personally review the patient's records, she further stated that the hospital obtained the information regarding the patient's prior mental healthcare "after two weeks or one week," and that these matters were discussed during the treatment team meetings. (Tr. 289.)
 {¶ 82} Dr. Tandon, a physician on the treatment team, testified that she did review Hessler's prior medical records. Those records included a clinical record from Harding Hospital, Hessler's medical records from a 1983 admission, as well as prior admissions to Ohio State University Hospital and Riverside Methodist Hospital. Thus, there was evidence presented indicating that the patient's medical records were available, and that the patient's treating physician reviewed them.
 {¶ 83} Despite appellants' contention that appellee failed to contact family members, LeDay-Smith testified that, in preparing a psychological summary, her sources of information included Hessler's mother and his brother. Dr. Tandon also reviewed a family history form completed by Hessler's mother containing background information and a record of hospitalizations. As noted by appellee, appellants' own expert, Dr. Reardon, acknowledged that appellee's staff members "had the information. If you read through the psychosocial summary, the psychological evaluation, the psychiatric intake evaluation, virtually all of these recent behaviors were documented by Eydie LeDay-Smith, Sharda Mehta and Dr. Tandon. So there's no question that they were aware of these things." (Tr. 1534.) We further note that appellee's expert, Dr. Warren, opined that LeDay-Smith's efforts in collecting information and developing the psychological summary for Hessler fell within the standard of care for a social worker.
 {¶ 84} Regarding the issue of Hessler's history of physical or sexual abuse, appellants cite to testimony by Mehta in which she stated that Hessler refused to talk about any past history of abuse. Appellants' expert, Dr. Beck, was critical of Mehta's failure to pursue this information in making a treatment decision. However, appellee's expert, Dr. Monahan, stated that Mehta had not "failed in that assessment," based upon the expert's view that "there is a modest association between being abused as a child and later on, being violent. It's not a major risk factor, and * * * it's not nearly as important of a risk factor as one's own prior violence." (Tr. 2163.)
 {¶ 85} Although appellants contend that appellee and its staff failed to discover the patient's history of stalking, the record indicates that the chart from appellee contained that history. Dr. Monahan noted that there were ample references in Mehta's own notes regarding the extent of Hessler's prior violence. Dr. Warren also testified that LeDay-Smith "was aware of Mr. Hessler's stalking behavior towards more than one woman, which would be sufficient information to inform that aspect of a risk assessment." (Tr. 2781.) Dr. Warren noted that the information was in the admission summary, and that "it was very apparent to all of the treatment staff that he had been stalking prior girlfriends." (Tr. 2782.)
 {¶ 86} Appellants also assert that appellee failed to conduct a thorough neurological evaluation to rule out "organicity" as a cause of the patient's mental illness. On this point, appellants' own expert, Dr. Smalldon, who interviewed Hessler shortly after the shootings at the request of Hessler's criminal defense lawyers, testified that he had performed neuropsychological tests on Hessler, and that he found no organic impairment. Dr. Smalldon, who conducted the testing in December 1995, acknowledged that, if the patient suffered from an organic impairment in May 1995, such condition would still have existed at the time of the testing. Moreover, the record indicates that Dr. Tandon ordered an EEG for the patient based upon information that he had suffered a head injury as a child. Dr. Tandon also testified that an EEG had been performed in 1983, and that the results were normal.
 {¶ 87} Regarding the contention that appellee failed to discover past abuses of amphetamines and caffeine pills, appellants point to testimony by Dr. Beck regarding a reference in the patient's record to past amphetamine use in 1982 or 1983. However, when asked whether there was any evidence that the patient had been using amphetamines during 1995, the witness acknowledged that there was "no information one way or the other." (Tr. 1303.) The record shows there was evidence that the patient had, during one occasion, returned to the hospital with caffeine pills, and that Dr. Tandon cautioned Hessler about the dangers of caffeine. While the evidence does not indicate whether the patient was actually abusing caffeine pills, Dr. Monahan testified that he did not consider potential caffeine abuse as part of substance abuse. Similarly, Dr. Neligh testified that, while amphetamines "are known to have certain negative effects on major mental illnesses[,] [t]he documentation isn't there for caffeine." (Tr. 3234.) Significantly, there is no evidence in the record suggesting a causal relationship between the patient's use of caffeine pills and his subsequent behavior.
 {¶ 88} Appellants also argue that appellee failed to engage the patient, in any meaningful way, in psychotherapy. On this point, the evidence indicated that appellee attempted to engage in psychotherapy with Hessler, but that he resisted engaging in discussions of certain matters. Dr. Monahan noted that Mehta "tried to engage him in psychotherapy," but that the patient "tended to be quite resistant to those attempts at dealing with his psychological problems." (Tr. 2023.) Dr. Monahan noted some improvement at the end of his stay, but that in general the patient "rebuffed repeated attempts to engage in psychological treatment." (Tr. 2023.)
 {¶ 89} However, in Dr. Monahan's opinion, the patient's reluctance to engage in psychological treatment did not mean that appellee should not have discharged him in July 1995. Specifically, Dr. Monahan testified that, in an "ideal world," it is hoped that a patient gain insight into his or her disorder, but "insight often doesn't come, and that people are resistant to psychotherapy." (Tr. 2024.) Dr. Monahan found significant that, at the time of discharge, the patient's "psychosis was, to a large extent, in remission," that "he presented no violent ideation," and that he "was compliant with medication while he was in the hospital." Dr. Monahan opined that Hessler no longer qualified for involuntary commitment at the time he was discharged, and the expert concluded that, "it met the standard of care for [appellee] to discharge Mr. Hessler because there was clear and significant improvement in his clinical condition over the course of hospitalization." (Tr. 2026.)
 {¶ 90} Commenting on the patient's denial of his mental illness, Dr. Warren testified that many psychiatric patients are in denial, and that requiring a patient to acknowledge that they have a mental illness "would not be a requirement for release into the community." (Tr. 2758.) Dr. Warren stated that, at the time of the patient's discharge, there was nothing more that appellee could have done for the patient on an inpatient basis. According to Dr. Warren, Hessler "was obviously still suffering from the symptoms or the characteristics of personality disorders," but that "these kinds of lifelong disorders cannot be treated in an inpatient context, if at all." (Tr. 2759.) As to the treatment of personality disorders, Dr. Warren stated that it is not possible, "on an inpatient unit, over a short period of time, to address the underlying conflict that leads to these symptoms." (Tr. 2765.) Rather, these forms of personality disorders are ingrained and constitute "life patterns." (Tr. 2765.) We note that appellants' expert, Dr. Smalldon, acknowledged this fact, stating that it was common for a psychiatric patient to lack insight into his or her mental illness, and that a lack of insight is not, in and of itself, a reason to keep a patient involuntarily committed.
 {¶ 91} We also find no merit to appellants' assertion that the Court of Claims erred in concluding that appellants failed to meet their burden of proving that appellee's treatment team should have requested that The Bridge provide a different aftercare case manager. Appellants argue that Dr. Tandon released Hessler into a traditional aftercare setting with knowledge that the case manager to whom he was assigned, Lisa Johnson, did not feel that Hessler was ready for discharge and that she was afraid of him.
 {¶ 92} In addressing this issue, the Court of Claims held that appellee "had no authority or duty to determine how or with what personnel [T]he Bridge performed its functions." The court further noted that the case manager had reported those fears to her supervisor without any resulting change.
 {¶ 93} At trial, LeDay-Smith testified that, although she was aware Johnson was afraid of Hessler, she anticipated that, if Johnson continued to be uncomfortable working with Hessler, "there were other people at The Bridge who could help her." (Tr. 2554.) According to Elizabeth Gitter, a clinical director at The Bridge in 1995, if a caseworker was uncomfortable visiting a client in a home setting, the agency would advise the caseworker to meet with the individual at the agency or at a neutral location in the community. Gitter did not recall ever having a conversation with Johnson in which she requested to be removed from the case.
 {¶ 94} Dr. Warren testified that it was Johnson's responsibility to talk with her supervisor and to arrange alternative means of dealing with the situation. The understanding of the treatment team was that Johnson's supervisor at The Bridge would be responsible for providing adequate care, "whether it was through Lisa Johnson in combination with John Paree or by reassignment." (Tr. 2827.) Dr. Warren stated that appellee was not responsible for monitoring the standard of care provided by employees of The Bridge. Rather, the responsibility of appellee was to ensure that, at the time of discharge, the patient was medication compliant, stabilized, and that an adequate aftercare program was in place. In the absence of any evidence that appellee had authority to arrange for The Bridge to assign a different caseworker, we find no error with the Court of Claims' determination on this issue.
 {¶ 95} We have already discussed portions of the expert testimony in addressing specific arguments raised under previous assignments of error. In appellants' remaining arguments, we consider more fully the expert testimony pertaining to the trial court's ultimate determinations that appellants failed to prove that appellee's treatment team was negligent in the implementation of an appropriate treatment plan and the subsequent decision to discharge the patient, and that appellee acted in good faith in its treatment and discharge of the patient, thereby entitling it to statutory immunity.
 {¶ 96} In arguing that appellee's conduct was negligent, and that appellee failed to act in good faith, appellants generally assert that Dr. Tandon and his treatment team had a duty to properly assess and treat Hessler upon his admission, and to discharge him only after a good-faith assessment of his condition revealed that he no longer posed a significant danger of physical harm to others. Appellants maintain that it was entirely foreseeable that, if Hessler were discharged into an environment that had no power to compel his compliance with treatment, the patient would be non-compliant, "decompensate," and cause harm to others.
 {¶ 97} Appellants point to the testimony of Drs. Beck and Smalldon in asserting that the actions of appellee and its staff were negligent, and that such negligence proximately caused appellants' injuries. At trial, Dr. Beck opined that it was a deviation from accepted standards of professional judgment and reasonable psychiatric care to discharge Hessler on July 20, 1995. We note that, in addressing the issue of standard of care, Dr. Beck criticized appellee for various purported omissions we have previously addressed, i.e., the failure to properly review the patient's past medical history or to follow up or address the patient's past history regarding amphetamines, the failure to properly evaluate Hessler's history of stalking, to consider the significance of possible caffeine use, and to rule out the possibility of organic causes. Dr. Beck also opined that, in "some important respects," appellee failed to implement the treatment plan, including the failure to properly assess the patient's risk of violence, the failure of the patient to demonstrate an understanding of his mental illness, and the failure of appellee and its staff to ameliorate their concerns as to the likelihood the patient would not comply with treatment recommendations, including medications, upon discharge.
 {¶ 98} Dr. Smalldon testified that, based upon his review of Hessler's hospital records, the patient's propensity for violence did not decrease in any significant manner by the time of his discharge. Dr. Smalldon opined that appellee's treatment team did not thoroughly evaluate Hessler's condition during his hospitalization such that it could, in good faith, formulate a treatment plan to properly balance the patient's interests with the interests of the public. He criticized appellee's staff for not succeeding "in drawing him [Hessler] out enough to even understand what the basis of this pattern of aggressive behavior was." (Tr. 660.) According to Dr. Smalldon, appellee's discharge of Hessler fell below the applicable standard of care, and he believed that it was reasonably foreseeable that the patient would "decompensate" and engage in acts of violence.
 {¶ 99} On cross-examination, Dr. Smalldon acknowledged that Hessler complied with taking medication during his hospitalization, and that Hessler's family members stated that he took his medications "in some quantity for some time after he left the hospital." (Tr. 817.) As noted above, Dr. Smalldon also conceded that it was common for a psychiatric patient to lack insight into his or her mental illness, and that lack of insight alone is not a reason to keep a patient involuntarily committed. Dr. Smalldon further agreed that, following Hessler's discharge, The Bridge was responsible for arranging for Hessler to receive his medications, and he was critical of The Bridge's aftercare treatment for not making an adequate effort to ensure Hessler's compliance with scheduled appointments in order for the agency's physician and caseworker to monitor his compliance and evaluate how he was functioning, including the agency's attempt to schedule appointments during Hessler's working hours. Had there been proper close monitoring, he believed that the probability that the murders would have occurred would have lessened.
 {¶ 100} As previously discussed, appellants' expert, Dr. Reardon, criticized appellee's staff for failing to properly assess the patient's risk factors for violence. Dr. Reardon further opined that the treatment plan formulated by appellee did not meet the standard of care because it did not address specific concerns other than the medication issue. While Dr. Reardon acknowledged that appellee met the standard of care as to the administration of medication, appellee's actions fell below the standard of care "for the type of treatment that was necessary and appropriate for someone with the types of disorders and the type of risk behavior that Jerry Hessler manifested." (Tr. 1552-1553.) Dr. Reardon believed that the appropriate way to treat this patient was through "an intensive program of individual therapy." (Tr. 1554.) The witness also felt that Hessler "needed to have some insight or understanding of what was going on with him, why he felt and did the things he did, that they were inappropriate and dangerous things to do, and what he could do as an alternative to that." (Tr. 1559.) According to this witness, the patient "was every bit as much of a risk when he was discharged" as when he was first admitted. (Tr. 1570.) Dr. Reardon opined that the patient was likely to be non-compliant with treatments and medications, and he believed it was reasonably foreseeable that Hessler, at the time of his discharge, would harm others because "[n]othing had been addressed. Nothing, in my opinion, had changed." (Tr. 1586.) Dr. Reardon also opined that, at the time of discharge, Hessler still met the criteria for involuntary hospitalization.
 {¶ 101} In contrast to the testimony of appellants' experts, Dr. Monahan testified that Hessler's psychosis was largely in remission at the time of discharge; the patient presented no violent ideation, he was compliant with medication and, while he resisted psychotherapy, his discharge met the standard of care because "there was clear and significant improvement in his clinical condition over the course of hospitalization." (Tr. 2026.) According to Dr. Monahan, in 1995, the standard of care as to an individual hospitalized under the commitment statute required that, when the patient's clinical condition stabilized, such that he or she no longer presented an imminent risk of violence to others, that individual no longer qualified for commitment and should be discharged. He testified that appellee's staff accurately assessed the patient's risk for violence, and that the hospital's adherence to psychotropic medication was an effective means of reducing the symptoms of physical disorders. By repeatedly attempting psychological treatments and observing the patient comply with medical treatment, appellee acted in accordance with the standard of care in their treatment of him as a patient involuntarily committed for violent acts.
 {¶ 102} According to appellee's expert, Dr. Neligh, who specializes in psychiatry and forensic psychiatry, following Hessler's admission, appellee and its staff formulated a course of treatment that had "all of the elements of a fairly standard state hospital treatment plan." (Tr. 3041.) Appellee's staff assessed all of the factors that comprised Hessler's imminent dangerousness at the time he was probated, and they addressed the patient's problems and risk factors, including propensity for violence, in accordance with the standard of care in 1995. He stated that the best method for assessing dangerousness "was to ask the person directly about their intent to do harm," and he noted that such assessments were documented in the chart. (Tr. 3059.) The fact that Hessler's treating physician, Dr. Tandon, asked "repeatedly about his intentions might have even been above and beyond the call of duty." (Tr. 3059.) As to medication treatment, the patient was provided a mood stabilizer, as well as antipsychotic medications to calm him down acutely. Dr. Neligh described appellee's decision to implement and monitor the patient's transition to a program of self-medication as "unusually good." (Tr. 3045.) He opined that appellee met the standard of care in stabilizing Hessler's acute mental illness that brought him to the hospital.
 {¶ 103} Dr. Neligh stated that, at the time of the patient's discharge on July 20, 1995, there was no evidence of present or imminent dangerousness concerning the patient. He opined that appellee's decision to discharge Hessler to traditional aftercare with The Bridge met the standard of care in 1995, and that appellee exercised good-faith professional judgment in its decision. Regarding the issue of medication compliance, Dr. Neligh stated that, while appellee's staff may have been able to debate the pros and cons of this issue, he doubted they would have been able to predict whether or not the patient would comply. Dr. Neligh believed that Hessler complied with taking his medications until sometime in September, and he stated that the aftercare treatment plan would have been sufficient to meet Hessler's needs if The Bridge's case manager had performed proper case management. The expert stated that Dr. Tandon made professional judgments regarding the treatment plan, and that it was reasonable for the treating psychiatrist to assume that the aftercare case manager would properly perform her duties. Regarding the treatment provided by the aftercare agency, Dr. Neligh testified that The Bridge did not meet the standard of care in 1995 for monitoring and providing community treatment to the patient.
 {¶ 104} Dr. Sadoff testified that a number of factors supported appellee's decision to discharge Hessler. The patient was not violent during his nine weeks of hospitalization, he became non-threatening, was compliant with his medication, and showed significant changes in his behavior and his attitude toward the staff. The patient also had employment, a place to reside, and the support of his family in the community, and he made assurances that he would take his medication after discharge, even though he did not feel that he needed it. Dr. Sadoff opined that, at the time of discharge, Hessler had improved and his mood was stabilized such that "he did not present as an imminent threat of harm to self or others," nor did he meet the criteria under R.C. Chapter 5122 to remain involuntarily hospitalized. (Tr. 2359.)
 {¶ 105} Dr. Sadoff also opined that appellee and its staff acted in good faith in its decision to discharge, including, as noted above, ensuring that the patient had a job, a place to live, as well as family support. Further, appellee acted as a link with the aftercare caseworker and The Bridge, the agency assigned as the outpatient treatment facility for Hessler following discharge. Dr. Sadoff further opined that it was the responsibility of The Bridge, as designated and assigned through the Unified Services Agreement by Netcare, working for the ADAMH Board, to assume responsibility for the type of case management Hessler would need following discharge, including the responsibility to ensure that the patient took his mediation and consulted with a psychiatrist while in the community.
 {¶ 106} Dr. Sadoff testified that Hessler began to decompensate in late October 1995. Hessler's mother had relayed information to The Bridge's caseworker, Lisa Johnson, indicating that Hessler was beginning to exhibit behavior similar to that which he displayed in May 1995, just prior to his hospitalization. Dr. Sadoff opined that The Bridge's psychiatrist, Dr. Pugliese, should have seen Hessler immediately upon learning of such behavior. He stated that the proximate cause of the injuries in this case was the lack of monitoring by The Bridge and staff, including Johnson, to ensure that Hessler was taking his medication and receiving the type of regular treatment he needed.
 {¶ 107} According to Dr. Sadoff, while appellee could make recommendations for post-discharge treatment, they could not plan such treatment. Rather, the plans were to be made by Netcare and implemented by The Bridge. Further, assuming the patient received the type of monitoring he was expected to receive from The Bridge, it was not foreseeable that the patient would be non-compliant as to his medication.
 {¶ 108} Dr. Warren opined that the aftercare plan formulated by appellee met the standard of care. According to Dr. Warren, the aftercare program indicated that the treatment team believed the patient had a willingness to be compliant if supported on an ongoing basis, meaning in this case, the assignment to The Bridge. At the time of discharge, the treatment team had reached their treatment goals and the patient was stabilized. Further, the treatment team "implemented a very reasonable aftercare program in collaboration with The Bridge and the case manager." (Tr. 2757.)
 {¶ 109} Dr. Warren further opined that Hessler's discharge from appellee on July 20, 1995, was not a proximate cause of the subsequent murders on November 19, 1995. The expert reasoned that the patient was stabilized, functioning adequately, and the treatment team goals, including dynamic risk factors, had been addressed. Dr. Warren stated that the patient eventually decompensated after his discharge "due to a lack of monitoring care that contributed to the events of November 19th." (Tr. 2769.)
 {¶ 110} While appellee's staff recognized that this was an individual who was at risk for violence if he was not maintained on medication, and while there were concerns that the patient might decompensate without medication, Dr. Warren stated that it was not clear that appellee knew the patient would be violent if that occurred. Moreover, she interpreted the records as indicating that the treatment team believed the patient would be compliant with the proper type of aftercare. Further, while it was important for appellee's staff to ensure the patient was "medication-compliant" in the hospital, and that he reached maximum therapeutic benefit, the "idea of maintaining that medication-compliant is then transferred as a responsibility to the community treatment team." (Tr. 2800-2801.)
 {¶ 111} In this case, as in many actions involving medical evidence, the parties presented opposing medical experts who rendered differing conclusions based upon the evidence presented, including contrary opinions as to whether the actions of appellee's employees, regarding the care, treatment and discharge of the patient, fell below the applicable standard of care. Despite those conflicting opinions, it was within the discretion of the trier of fact to determine which expert or experts were more credible, and we do not find that the court's ultimate resolution of the competing evidence was against the manifest weight of the evidence. Rather, based upon the substantial evidence presented, we find that the Court of Claims could have reasonably reached the permissible determination that appellee's treatment team did not act negligently in treating and discharging the patient, and that appellee and its personnel acted in good faith and exercised professional judgment in its decision to discharge the patient.
 {¶ 112} One of appellants' major contentions is that appellee acted negligently because it knew the patient was potentially dangerous if he did not comply with his medication, and knew or should have known that he would discontinue taking medications once he was in the community. However, although appellee's staff was aware of the patient's past violence and had concerns regarding the issue of compliance, there was evidence that the treatment team's expectation was that the patient would comply if provided appropriate aftercare. This view is reflected in the testimony of LeDay-Smith, a member of appellee's treatment team, who testified that she believed the patient would be compliant with medication, if properly monitored, based upon the fact he had been compliant in the hospital, and his assurances to the treatment team that he would be compliant after his discharge. On cross-examination, she acknowledged having concerns about the patient's future compliance, but emphasized that she anticipated he would be compliant with assistance from the aftercare community health provider. In considering the evidence on this issue, Dr. Monahan testified that, while the patient was at risk of non-compliance, "it was hardly the case that [appellee's staff] knew or should have known he would be noncompliant." (Tr. 2295.) As previously noted, there was also expert testimony that it was reasonable for the treating psychiatrist to assume that the aftercare provider would properly monitor this individual. Thus, there was evidence upon which the court could have concluded that appellee's staff had a reasonable belief that the aftercare agency would adequately monitor the patient, and that he would therefore likely remain compliant with his medication.
 {¶ 113} We note that appellants' expert witness, Dr. Beck, agreed that the patient's discharge would have been proper as long as there existed a reasonable expectation he would take his medication. Dr. Beck also acknowledged, during cross-examination, that Hessler took his medication for a period of time after his discharge, and he agreed that, "to the extent that he did take [the medication] for some period of time," appellee did not have reason to know the patient would not comply. (Tr. 1447.)
 {¶ 114} We further note opinion testimony by Dr. Warren and others that this patient could have been adequately monitored by a caseworker in the context of traditional aftercare. Dr. Warren testified that, if the patient, on the date of discharge, was compliant with medication and not dangerous, "it would then become the responsibility of the community program to monitor, to ensure compliance with medication, and to probate him again if they thought he began to reach the standard for involuntary commitment." (Tr. 2832.) Dr. Beck acknowledged that, following discharge, The Bridge became the sole provider of mental health services for Hessler.
 {¶ 115} In its decision, the Court of Claims noted, as significant, the fact that Hessler's attending doctors and treatment team believed, at the time of his discharge, that he was stable and had progressed as far as he could in an inpatient setting. Under Ohio law, a hospital is not free to retain a patient indefinitely when the reasons for the initial commitment are no longer applicable (i.e., in this case, the initial commitment being made because the patient presented a substantial risk of physical harm to himself or others, or because his behavior created a grave and imminent risk to substantial rights of others or himself). In its decision, the court recognized the fact that the ADAMH Board and appellee would have lost any legal authority to retain Hessler as an involuntary patient as of August 15, 1995 (90 days after his commitment), unless, ten days before that date, an agency requested the probate court to extend his commitment. Such a request would have required the probate court to conduct a new hearing and make a new finding, based upon clear and convincing evidence, that the individual was presently a mentally ill person subject to hospitalization by court order.
 {¶ 116} Despite appellants' arguments to the contrary, there was competent evidence that the patient did not pose a danger to himself or others immediately following his release (and for several months thereafter). We note that, in addition to the significant testimony by appellee's experts on this issue, appellants' expert witnesses, M. Randall Crowley, who was asked to review clinical records regarding the services rendered by the social workers in the case, also testified that there was nothing in the records to indicate that Hessler was a danger to himself or others at the time he was discharged, further noting that the patient's emotional state was stable at that time. Similarly, another of appellants' experts, Dr. Beck, testified that Hessler was not imminently dangerous at the time of his discharge.
 {¶ 117} Thus, there was evidence that, as of July 20, 1995, the patient was no longer imminently dangerous, was compliant with his medication, and had reached optimal benefit from hospitalization. Further, the treatment team had addressed the patient's dynamic risk factors, and an aftercare program was in place. As part of the discharge plan, appellee's staff worked in conjunction with the aftercare agency assigned to assume responsibility for monitoring the patient, including his medication needs, after discharge. At that time, appellee and its staff made a professional judgment that the patient was stable and no longer met the criteria for hospitalization. In light of such evidence, the trier of fact could have reasonably concluded that the clinical and legal responsibility of appellee, at that time, was to transfer the patient's care to the least restrictive alternative, the aftercare community services center, who in the judgment of appellee's treatment team was properly equipped to assume his clinical maintenance.
 {¶ 118} Upon review, we find that there was competent, credible evidence to support the Court of Claims' determination that the patient's course of treatment, resulting in his discharge on July 20, 1995, was reasonable in accordance with the applicable standard of care.
 {¶ 119} We also find that the Court of Claims did not err in its determination that appellee's staff acted in good faith in its decision to discharge the patient. The good faith determination under R.C. 5122.34
involves a weighing of a defendant's acts or omissions to determine whether the defendant acted on the basis of a judgment, honestly arrived at, that the subject should be released. Loughran v. Kettering Mem.Hosp. (1998), 126 Ohio App.3d 468, 474. In order to rebut that presumption, it must be shown that no reasonable psychiatrist would have released the patient. Id. This court has previously held that, "[b]ecause of the unpredictability and the inability to foresee psychiatric patients' actions, a psychiatrist has done his duty if, after examining all of the relevant data, the psychiatrist makes a professional judgment that the patient would not harm himself or others." Brooks v. Ohio Dept.of Mental Health (Nov. 14, 1995), Franklin App. No. 95API04-505.
 {¶ 120} Here, there was competent, credible expert testimony, as cited above, upon which the trier of fact could have relied upon in finding that appellee and its personnel "acted in good faith, relying on actual knowledge or information they thought to be reliable," in participating and assisting in the patient's discharge. Thus, the trial court did not err in holding that appellee was immune from liability pursuant to R.C. 5122.34.
 {¶ 121} Accordingly, appellants' seventh, eighth, eleventh, thirteenth, fifteenth and sixteenth assignments of error are without merit and are overruled.
 {¶ 122} Finally, under the fourteenth assignment of error, appellants assert that the trial court erred in finding that The Bridge's negligent conduct was a superceding intervening cause that prevented any conduct by appellee from being a proximate cause of appellants' injuries. In light of our disposition of the preceding assignments of error, finding that the trial court did not err in its determination that appellee acted in good faith, and that appellee's conduct in treating and discharging the patient was not negligent under the applicable standard of care, the issue raised under this assignment of error is moot. Therefore, appellants' fourteenth assignment of error is overruled as moot.
 {¶ 123} Based upon the foregoing, appellants' first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, thirteenth, fifteenth and sixteenth assignments of error are overruled, the twelfth assignment of error is disregarded under App.R. 12, the fourteenth assignment of error is overruled as moot, and the judgment of the Ohio Court of Claims is hereby affirmed.
Judgment affirmed.
Petree, P.J., and Klatt, J., concur.
[1] Although appellants' statement of assignments of error contains the above 12th assignment of error, the body of appellants' brief contains no argument regarding this statement of assignment of error. Because appellants fail to present any specific argument with respect to this statement of assignment of error, we disregard it based upon App.R. 12(A)(2) and 16(A)(7). See State v. Watson (1998), 126 Ohio App.3d 316,321.
[2] In its decision, the Court of Claims, in considering the language of the Unified Services Agreement, set forth the names of the various agencies and individuals, as applicable, in brackets. We have reproduced the bracketed names as listed in the court's decision.
[3] Although appellants' statement of assignment of error lists 16 assignments of error, only 15 assignments of error are argued in appellants' brief. We note that appellants' statement of assignment of error No. 13 is argued in the body of the brief as assignment of error No. 12; statement of assignment of error No. 15 is argued as assignment of error No. 14; and, statement of assignment of error No. 16 is argued as assignment of error No. 15.