[Cite as *Ibrahim v. Ibrahim*, 2013-Ohio-5401.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Hanif Ibrahim,                                         :

     Plaintiff-Appellant,                         :

v.                                                    :            No. 13AP-681
                                                              (C.P.C. No. 12DR-1670)
Sakhi Ibrahim,                                        :
                                                              (REGULAR CALENDAR)
     Defendant-Appellee.                          :

---

D E C I S I O N

Rendered on December 5, 2013

---

*Elizabeth N. Gaba*, **for appellant.**

*Law Offices of Virginia C. Cornwell*, **and** *Virginia C. Cornwell*, **for appellee.**

*Swope & Swope,* **and** *Kristy Swope*, **Guardian ad Litem.**

---

**APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations**

TYACK, J.

{¶ 1} Hanif Ibrahim is appealing from portions of his divorce decree. His counsel assigns three errors for our consideration:

> 1. The trial court erred to the prejudice of Appellant in awarding sole custody of Ishaq to Sakhi, placing no restrictions on her relocation with the child, and forcing Hanif to sign for a passport for Ishaq and requiring Hanif to agree to Ishaq traveling with Sakhi out of the country, and in particular to Dubai. This error is of Constitutional dimension. It deprives Hanif of his right to association with his child and to be free from a deprivation of substantive due process of law in violation of Hanif's 1st, 4th, 9th and 14th Amendments rights, and further deprives him of his rights to equal protection of the courts in violation of the 1st and 14th Amendments, and his rights under the Ohio Constitution. It

deprives Ishaq for his right to association with his father and to be free from a deprivation of substantive due process of law in violation of Ishaq's 1st, 4th, 9th and 14th Amendments rights, and further deprives him of his rights to equal protection of the courts in violation of the 1st and 14th Amendment, and his rights under the Ohio Constitution.

2. The trial court erred to the prejudice of Appellant in awarding sole custody of Ishaq to Sakhi, placing no restrictions on her relocation with the child, and forcing Hanif to sign for a passport for Ishaq and requiring Hanif to agree to Ishaq traveling with Sakhi out of the country, and in particular to Dubai.  This award to Sakhi, and lack of restrictions on Sakhi were not supported by the evidence and are not in the best interest of the child.

3. The trial court erred to the prejudice of Appellant in awarding sole custody of Ishaq to Sakhi, rather than shared parenting to both parties, on the basis that neither party had filed a shared parenting plan.  The parties filed an Agreed shared parenting plan on June 14, 2012.  To interpret the statute otherwise is to permit the selective or discriminatory enforcement of a Sec. 3109.04(A)(1), in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as well as the Due Course of Law Provision and Article I Section 16 of the Ohio Constitution.  To interpret the statute otherwise means that sec. 3109.04(A)(1) is unconstitutional not just "on its face", but "as applied", both for Hanif and Ishaq.

{¶ 2}   Although the assignments of error are lengthy, they all turn on the same question: Whether Hanif's ex-wife can be trusted to keep her residence with the couple's one-year-old son, Ishaq, in this country.

{¶ 3}   Hanif is afraid that his ex-wife is going to flee the country with the child and, as a result, he will lose all contact with his son.  The trial court addressed this issue at length in the divorce decree:

Defendant Mother did testify that in an affidavit to the Court on May 1, 2012, she was requesting sole custody of Ishaq and leave of Court to return to Dubai.  However, at trial she testified that her intent is not currently to leave the United States.  She testified that she had a green card that allows her to be in this country on condition of marriage, which expired on March 31, 2013.  Defendant Mother further testified that she has an immigration attorney, and she is working with

same to get the condition of marriage removed from her green card so that she may stay in the United States. Defendant Mother is confident that she will be allowed to stay in the United States, and believes she has timely applied and is requesting permission based upon abuse by a U.S. citizen and her civil protection request.

* * * No credible evidence was presented that Defendant Mother is a flight risk or that reasonable international travel with Ishaq should not be permitted.

(R. 327, at 15-16, Decree of Divorce.)

{¶ 4} The trial court also addressed the issues of involving the child in more detail elsewhere in the decree following the mandates of R.C. 3109.04:

### VI. ALLOCATION OF PARENTAL RIGHTS AND RESPONSIBILITIES

Although Plaintiff Father, in his April 17, 2012, *Complaint for Legal Separation*, requested sole custody, or in the alternative, Shared Parenting, Plaintiff's May 13, 2012 *First Amended Complaint*, which requested divorce rather than legal separation, contained no such request for shared parenting. Defendant Mother's argument is that Plaintiff Father's *First Amended Complaint* did not renew his original request for Shared Parenting, and therefore, the Court may not consider his request for Shared Parenting. Nonetheless, the Court finds that the Plaintiff Father did **not** file a Proposed Shared Parenting Plan, and therefore, any such request for Shared Parenting will not be considered.

R.C. 3109.04(F) provides the statutory criteria for the court to consider in the allocation of parental rights and responsibilities. In a divorce, the court must allocate the parental rights and responsibilities for the minor children born as issue of the marriage. R.C. 3109.04(A).

The Court makes the following findings with respect to the factors of R.C. 3109.04(F)(1):

**A. "The wishes of the child's parents regarding the child's care;" R.C. 3109.04(F)(1)(a).**

Based upon Plaintiff Father's narrative testimony, he wants sole custody of Ishaq, and is willing to work on 50/50 time share of parenting time with the Defendant if she can stay in

this country after March. However, as stated within his *Closing Statement, Findings and Facts and Recommendations of Plaintiff*, Plaintiff Father requested shared parenting with equal parenting time by alternating weeks for the next four years and then for the remaining years, alternating two week periods with no provision for holidays, vacations, or international travel.

Based upon her testimony, the Defendant Mother is requesting sole custody so long as she resides within Ohio. She is requesting a schedule of several day visits on Wednesdays, and alternate Saturday and Sundays, as she has concerns with the minor child having overnights with the Plaintiff Father prior to the child being able to communicate his needs. Plaintiff Mother's concern was aptly demonstrated in her testimony concerning Ishaq's day visit with Father on or about August 18, 2012, wherein Mother sent him in a clean diaper marked with an "X" inside the diaper prior to the 10:00 a.m. scheduled parenting time. After the conclusion of Father's parenting time at approximately 1:00 p.m., Mother testified that Ishaq remained in the same diaper for this time period as demonstrated by the presence of the "X" in the diaper upon the child's returning home to her.

Defendant Mother also testified regarding what she perceived as Plaintiff Father's determination to switch Ishaq to formula while she was still breast feeding, despite her requests and what she believes was the recommendation of Ishaq's pediatrician. Defendant Mother also testified regarding a time where Ishaq had to go to the emergency room for projectile vomiting immediately after the conclusion of Plaintiff Father's visit. On that occasion, according to Defendant Mother, Plaintiff Father was reluctant to answer the doctor's questions about what he had been feeding Ishaq. Despite Defendant Mother's concerns about Ishaq's safety, she has not denied Plaintiff Father parenting time.

During the pendency of the litigation, the parties have engaged in a parenting schedule providing Plaintiff Father parenting time with Ishaq every Tuesday and Thursday from 6:00 p.m. until 9:00 p.m. and every Saturday and Sunday from 10:00 a.m. until 1:00 p.m. Defendant Mother proposes an expanded schedule to include one overnight once Ishaq is two years old, and once he reaches school age, she proposes some slight additional time for Plaintiff Father.

Although Defendant Mother has been Ishaq's primary caregiver since birth, the schedule has allowed Ishaq to have regular and frequent contact with Plaintiff Father. Plaintiff Father testified that he repeatedly spoke to the Guardian ad litem to request overnight visitation.

Plaintiff Father's parents, whose permanent residence is in Pakistan, were staying with him at the time of trial. Plaintiff believes that his parents are suitable caregivers for Ishaq while he is at work. He would like Ishaq to have more time at his house, with his parents watching Ishaq while he is at work. However, Defendant Wife testified that due to concerns about the age and medical conditions of the paternal grandparents, she did not believe that they could properly care for the baby without assistance from Plaintiff Father. Defendant Mother believes that Ishaq's paternal grandmother is unable to lift him at his current weight. Ishaq's paternal grandfather is in failing health, and, according to Plaintiff Father, has been diagnosed with cancer. Defendant Mother also indicated that since neither grandparent drives or speaks English, she is concerned about Ishaq in the event of an emergency. Defendant Mother also expressed some concern about paternal grandmother's use of anti-psychotic medication, but it is not clear as to the extent of her psychological issues, if any.

**B. "If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;" R.C. 3109.04(F)(1)(b).**

The Court did not conduct an interview of the child in chambers, and neither parent requested an in-camera interview.

**C. The child's interaction and interrelationship with his parents, siblings, and any other person who may significantly affect the child's best interest; R.C. 3109.04(F)(1)(c).**

Both parents gave testimony demonstrating that they are very bonded to their child and show genuine love and affection for Ishaq. Although Ishaq is only one year old, he has had the opportunity to spend a good deal of time with both his maternal and paternal grandparents. Ishaq's maternal

grandparents have visited from Dubai, and his paternal grandparents from Pakistan, are currently staying with the Plaintiff Father. Defendant Mother does not have relatives in the area, but she testified that she has made efforts to establish a support system and network of friends, including participating in "playgroups" with Ishaq, and joining parenting and cultural groups.

## D. The child's adjustment to the child's home, school, and community; R.C. 3109.04(F)(1)(d).

Ishaq has been cared for at home since his birth with Defendant Mother as the primary caregiver. Both parties have residences located close to each other, within a few minutes of the Gahanna police station. Defendant Mother testified that Ishaq is well fed, well clothed and happy. Ishaq is established with a pediatrician. Defendant Mother has joined play groups and culture programs with Ishaq.

## E. The mental and physical health of all persons involved in the situation; R.C. 3109.04(F)(1)(e).

There are no health concerns evidenced in the record regarding either child or their parents. Plaintiff Father testified that he had concerns about scratches the child had on his face alleging that the scratches were due to Defendant Mother's failure to properly clip the child's nails.

## F. The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; R.C. 3109.04(F)(1)(f).

The Court finds that the Defendant Mother is more willing to honor and facilitate the Plaintiff Father's parenting time rights. Defendant Mother testified that she did not always feel that Plaintiff Father exercised the best care for their son during his parenting time, but has continued to follow the Court ordered parenting time. Defendant Mother has continued her efforts to communicate to Plaintiff Father the important information with respect to Ishaq including his health, nutritional needs, and developmental milestones, despite Plaintiff Father's self-serving rebuffs and critical responses. Defendant Mother testified to a certain degree of reluctance to allow parenting time in excess of the court ordered time, recalling that she did not grant Plaintiff Father additional parenting time as Plaintiff Father had requested when his brother was in town. However, Mother further

explained that she was unable to have the Guardian ad litem verify this additional parenting time, and was concerned that agreeing to additional parenting time without the Guardian ad litem's knowledge and approval in advance, that Plaintiff Father would claim that Defendant Mother failed to pick-up the child. In light of Plaintiff Father's prior actions and comportment, this refusal would be reasonable. Defendant Mother also testified that she has been late a few times for the exchanges, but has contacted the Plaintiff Father as soon as the issue arose.

In contrast, significant testimony was presented that the Plaintiff Father does not follow this Court's Orders. The Plaintiff Father testified that he did not maintain the Defendant Mother's health insurance, in violation of the Court's Temporary Orders, and did not inform Defendant Mother about the health insurance lapse. Yet, he maintained dual health coverage for himself. At the time of trial, Plaintiff Father had not yet taken the additional parenting classes he was ordered to take six months earlier. Plaintiff Father also testified that he did not remember if he turned over food stamps to the Defendant Mother as he was required to do pursuant to the Temporary Orders. He also testified that he has not paid the medical bills associated with Ishaq's birth, but further testified that he had paid some of his father's medical bills.

Of further importance, Defendant Mother provided credible testimony that Plaintiff Father is chronically late to the parenting exchanges. Defendant Mother testified that he blames his chronic tardiness on work conflicts, and traffic. It is of great concern that Plaintiff Father does not take responsibility for his actions as evidenced by Plaintiff Father's evasive testimony and lack of credibility. Rather than take responsibility for his actions, he consistently shifts the blame to the Defendant Mother. He testified that he often leaves his residence to return his child at 9:00 p.m., and that he is aware that the exchange is 19 minutes from his house. When asked if he was on time for exchanges, Plaintiff Father stated that he has asked for the Guardian ad litem to move the exchanges to 6:30 p.m. (rather than the currently scheduled 6:00 p.m.) and for overnight parenting time. He also deflected indicating that Defendant Mother is 15-20 minutes late for exchanges.

His consistent lateness for a parenting time schedule that has been in place since June 14, 2012, (as agreed) shows not only an arrogance and disregard for the value of Defendant

Mother's time, but a lack of insight as to how it negatively affects his infant son to be made to regularly wait in a public space or car for long periods of time without a valid basis. The Plaintiff Father's chronic lateness in returning the child to Defendant Mother is a further denial of Defendant Mother's parenting time.

Plaintiff Father did testify that he has agreed to parenting schedule changes in the past, citing an instance right before Ramadan when the exchange was moved to an earlier 5:00 p.m. time.

**G. Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor; R.C. 3109.04(F)(1)(g).**

As of February 12, 2013, Plaintiff Father had a child support arrearage in the amount of $4,279.65. See *Defendants Exhibit X.* Based upon the parties' testimony, Defendant Mother did not receive any financial support for the first five months after Ishaq was born, and Plaintiff Father's meager contribution consisted of one pack of diapers and several outfits. However, Plaintiff Father testified that he is the sole supporter of his parents whom live with him, and that they do not contribute to his household expenses. Plaintiff Father also testified that he has not fully paid the medical bills associated with Ishaq's birth, but he has paid some of his father's medical bills.

Further, Plaintiff Father applied for public assistance on July 3, 2012, and misrepresented that his wife and son were currently residing in his home. See *Defendant's Exhibit Y.* Plaintiff Father's lack of financial support is further worsened in light of Defendant Mother's testimony that her father provided $20,000.00 to Plaintiff Father during the short course of their marriage. Further, although the Magistrate ordered Plaintiff Father to provide any food stamps to the Defendant Mother, Plaintiff Father testified that he did not recall whether or not he did so.

**H. Whether either parent previously has been convicted of or pleaded to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been**

**adjudicated an abused child or neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the bases of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding, whether either parent previously has been convicted of or pleaded guilty to an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and where there is reason to believe that either parent has acted in a meaner resulting in a child being abused or a neglected child; R.C. 3109.04(F)(1)(h).**

No evidence was presented on this issue.

**I. Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent his or her right to visitation in accordance with an order of the court; R.C. 3109.04(F)(1)(i).**

This issue was previously addressed in subsection F. above.

**J. Whether either parent has established a residence, or is planning to establish a residence, outside the state; R.C. 3109.04(F)(1)(j).**

Plaintiff Father testified that he and Ishaq are U.S. citizens, a focus that he emphasized throughout his testimony. Plaintiff Father was born in Pakistan, and has family in Pakistan, India and Dubai, United Arab Emirates (UAE). His parents have their permanent home in Pakistan, but are currently staying with the Plaintiff Father. Defendant Mother was born in India, and has family in India and Dubai, UAE. Her parents reside in Dubai, United Arab Emirates. Defendant Mother testified that they first met online in October 2010 on two arranged marriage web sites, and then met face-to-face in December 2010 with Defendant Mother's father's permission. Defendant Mother testified that Plaintiff Father seemed settled and ready to start a family. She further testified that she felt he was appropriate as a husband because he wanted

his children to have an Islamic upbringing, was financially able to care for her, and that he wanted to return to the Middle East when the children were school age.

Defendant Mother testified that in December 2011 while she was pregnant, that Plaintiff Father made threats of abduction. They fought, and Plaintiff Father asked her to leave. He threatened that if she tried to leave the United States with the child, he would shoot her and run away.

Although these parties originally focused on a similarity of their culture, it appears that there was much disagreement about the practice of "confinement" wherein a woman, from the time she is seven months pregnant until a minimum of 40 days after the child's birth, is in the care of her mother's family. Defendant Mother testified that she would engage in this traditional practice if she still lived at home. Defendant Mother testified that she believed Plaintiff Father felt threatened about this practice, so Defendant Mother's parents decided to come to the U.S. Defendant Mother testified that her parents came to the U.S. in January 2012 and rented an apartment; on February 25, 2012, Plaintiff Father threw her out of the house, and she moved into the apartment with her parents. There were many attempts at reconciliation including dinners at each other's houses and celebration of an anniversary. Defendant Mother relayed in her testimony that some days the Plaintiff Father was nice and sweet, and other days he was rude and mad.

Defendant Mother did testify that in an affidavit to the Court on May 1, 2012, she was requesting sole custody of Ishaq and leave of Court to return to Dubai. However, at trial she testified that her intent is not currently to leave the United States. She testified that she had a green card that allows her to be in this country on condition of marriage, which expired on March 31, 2013. Defendant Mother further testified that she has an immigration attorney, and she is working with same to get the condition of marriage removed from her green card so that she may stay in the United States. Defendant Mother is confident that she will be allowed to stay in the United States, and believes she has timely applied and is requesting permission based upon abuse by a U.S. citizen and her civil protection request.

Defendant Mother provided credible testimony that she intends to remain in the United States, acknowledged Ishaq's need for a relationship with his Father, and outlined her plan

for supporting herself here. These plans include joining a medical transcriptionist class, and ultimately completing her residency to become a medical doctor. She also testified with respect to the cultural groups, play groups and parenting groups that she has participated in order to establish a support system and further integrate herself and Ishaq into the community. At the time of trial, no evidence was presented that she was not legally in the United States or under the threat of deportation. The Court finds Defendant Mother's testimony to be credible. No credible evidence was presented that Defendant Mother is a flight risk or that reasonable international travel with Ishaq should not be permitted.

Plaintiff Father did not present any evidence that he intends to move outside of the state. Plaintiff Father testified regarding his fears that the Defendant Mother would move outside of the United States and further testified as to what he perceived as the likelihood that Defendant Mother was going to take Ishaq and leave the United States and go to countries which may not be signatories to the Hague Convention. In his testimony, Plaintiff Father admitted that when Defendant Mother returned to her apartment from the hospital after Ishaq's birth rather than return with him to his residence, he considered such an act as "child abduction" even though Plaintiff Father actually drove Defendant Mother and Ishaq to Defendant Mother's apartment. Plaintiff Father also admitted upon cross-examination that he has placed alerts with the U.S. Department of State and Interpol, Center for Missing Children, the U.S. passport office indicating that his child is at risk of being abducted. In order for the Defendant Mother to be able to travel internationally with Ishaq, Plaintiff Father would have to remove any existing barriers to international travel he has initiated, both in the United States and abroad, and refrain from initiation any new obstacles to Ishaq's travel.

In addition to abduction alerts to state and international agencies, the Plaintiff Father also admitted that he contacted U.S. Immigration, and testified that he told immigration officials that his marriage was a sham, and that Defendant Mother only married him for a green card. Plaintiff Father also testified that he destroyed Defendant Mother's green card, and other forms of her identification. Plaintiff Father reiterated to this Court on many occasions that he was a naturalized citizen, and clearly believes that this designation provides a basis for him to obtain sole custody of this child. Plaintiff Father's actions further indicate that he believes

Defendant Mother should be deported. During the marriage, there was significant conflict about Defendant Mother's identification, particularly her green card which documented that she was legally within the country. Defendant Mother testified that she was often asked to leave the marital residence, but that Plaintiff Father would not provide her with her identification when she asked for it.

**K. Other Relevant Evidence**

1. <u>Communication between the Parents</u>: Defendant Mother has continued attempts to communicate with Plaintiff Father despite Plaintiff Father's physical and emotional abuse. Plaintiff Father clearly rebuffs Defendant Mother when she attempts to relay pertinent information as to Ishaq. It appears that Plaintiff Father's sole focus is Defendant Mother's lack of citizenship and his anger at her, rather than providing a conducive environment of respect to encourage Defendant Mother to openly engage with him and facilitate co-parenting. Plaintiff Father simply cannot cooperate with Defendant Mother despite her on-going efforts to do so. It is incumbent upon Plaintiff Father to reconsider the effects of his behavior upon his child, as well as the effects upon his parenting time. Clearly, Plaintiff Father has the ability to encourage the sharing of love, affection, and contact between the child and the other parent, but it is unclear if he is willing to do so.

Plaintiff Father testified that he does not want to continue to exchange Ishaq at the Gahanna Police Station, yet Defendant Mother testified with regard to Plaintiff Father's erratic behavior at exchanges, including telling people in the parking lot that this was an international abduction case. Defendant Mother also testified that at a recent exchange that when Ishaq began to cry that Defendant Mother attempted to comfort Ishaq by patting his head and speaking to him, Plaintiff Father smacked Defendant Mother's hand away.

2. <u>Any history of, or potential for, child abuse, spouse abuse, other domestic violence or parental kidnapping by either parent</u>:

In his narrative testimony, Plaintiff Father made several allegations that Defendant Mother falsified a lot of information, but he was not specific as to what she falsified other than the Defendant Mother had filed a petition for a civil protection order (which was granted). He also testified

that there had been an abduction threat, but he failed to present any evidence to support this perception. In fact, Plaintiff Father was often evasive and not credible during much of his testimony.

Defendant Mother testified as to Plaintiff Father's controlling behaviors. She testified that she felt as though she was "under house arrest" – stating that Plaintiff Father controlled everything including finances, phone, computer, and car keys. During the marriage when Defendant Mother was still living with the Plaintiff Father, and his parents were also residing there, Defendant Mother testified that Plaintiff's father kept the house keys and his mother kept the car keys if Plaintiff Father was not present. Defendant Mother testified that she had no access outside the house unless a neighbor took her out, which was rare. She also testified that Plaintiff Father would often tell her to leave the house, and she would ask for her identification, and Plaintiff Father would refuse to provide same. Plaintiff Father continually accused Defendant Mother of marrying for a green card.

Defendant Mother testified that Plaintiff Father physically abused her on two occasions during the marriage. Defendant testified that August 28, 2011, was the first time Plaintiff hit her. He threw her laptop, pushed her against a wall and told her to leave. On January 20, 2012, Defendant Mother testified that Plaintiff Father asked for her passport, and she asked for her green card in return. He began screaming at her, hit her, slapped her, and pushed her on the bed. She recalled that he was screaming at her that her father would not give him the money he had requested. At this time she was 30 weeks pregnant, and she was sent to the hospital for observation.

3. Recommendation of the guardian ad litem of the child: The Guardian ad litem issued her interim recommendation and report on February 20, 2013. She participated in the trial of this matter, and was available for cross-examination, yet neither party called her to testify. She filed her *Final Report and Recommendation of Guardian ad Litem* on March 29, 2013. The Court has thoroughly reviewed each report and recommendation.

In Plaintiff Father's narrative testimony, he testified that he felt that the guardian ad litem was too biased.

(R. 327, at 6 – 19, Decree of Divorce.)

{¶ 5}   Turning to the individual assignments of error, the facts alleged in the assignment of error do not correspond with the provisions of the decree set forth above.

{¶ 6}   Divorce and ancillary custody actions are purely matters of statute. *Shively v. Shively*, 10th Dist. No. 94APF02-249 (Sept. 22, 1994), citing *State ex rel. Papp v. James*, 69 Ohio St.3d 373, 379 (1994). In such actions, domestic relations courts have jurisdiction, as statute confers and limits it, to allocate parental rights and responsibilities for the care, custody, and control of a child. *Id.*; *see* R.C. 2301.01; R.C. 3105.03, 3105.21, and 3109.04. In reviewing statutes, we are obligated "to give effect to the words used and not to insert words not used." *In re James*, 113 Ohio St.3d 420, 2007-Ohio-2335, ¶ 13.

{¶ 7}   The first assignment of error alleges that the trial court erred and deprived Hanif of his right to association with his child, his right to substantive due process, and his right to equal protection, as well as depriving Ishaq of the same rights.

{¶ 8}   Initially we address Hanif's presumption to be asserting the constitutional rights of Ishaq in this appeal. Ishaq was a party to this divorce having been appointed a Guardian *ad Litem* and had a right to file an appeal in this case. *Schottenstein v. Schottenstein*, 10th Dist. No. 00AP-1088 (Nov. 29, 2001). An appellant cannot raise an issue on another's behalf, especially when that party could have appealed. *In re D.T.*, 10th Dist. No. 07AP-853, 2008-Ohio-2287, ¶ 8. Hanif has no standing to appeal on behalf of Ishaq in this appeal.

{¶ 9}   In reviewing the trial court's decision, we are guided by a presumption that the trial court's findings are correct. The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that "the trial judge is best able to view the witnesses, observe their demeanor, gestures, voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Griffin v. Twin Valley Psychiatric Sys.*, 10th Dist. No. 02AP-744, 2003-Ohio-7024, ¶ 28.

{¶ 10} The trial court heard the actual testimony from Sakhi and found her credible. Based upon the testimony presented in open court, the trial court judge concluded that Sakhi was not going to flee the country with the child. The trial court judge also concluded that Sakhi believed that Hanif should be involved in raising the child.

{¶ 11} We are not in a position to overturn that set of factual findings by the trial court judge. Given those factual findings, Hanif will not lose access to the child.

{¶ 12} The first assignment of error is overruled.

{¶ 13} The second assignment of error argues the trial court, in awarding sole custody of Ishaq to Sakhi without restrictions, was not in the best interest of the child and was not supported by the evidence.

{¶ 14} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279, 280 (1978). The in-court testimony of Sakhi constituted competent credible evidence to support the trial court's orders. Hanif's fears are understandable, but his fears do not outweigh the testimony of his ex-wife which was found to be credible by the trial court judge.

{¶ 15} Further, the trial court addressed the issue of international travel directly and implemented a number of procedures and restrictions to ensure that the child would be allowed to reasonably travel. These procedures include requiring written consent for travel to be obtained from both parents, having the Guardian ad Litem hold Ishaq's passport when not in use, and requiring the non-traveling parent to take all actions necessary to facilitate the travel. (R.327, at 26-27 Decree of Divorce.) It is evident that the trial court attempted to address the fears of Hanif but at the same time not hinder Ishaq, who no doubt would benefit from international travel with much of his extended family abroad, whose best interest the trial court is obligated to uphold.

{¶ 16} The second assignment of error is overruled.

{¶ 17} The third assignment of error argues the trial court erred in awarding sole custody rather than shared parenting to both parties, on the basis that neither party had filed a shared parenting plan.

{¶ 18} "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." *Miller v. Miller*, 37 Ohio St.3d 71, 74

(1988).  A trial court's discretion in custody matters is broad but must be guided by the language set forth in R.C. 3109.04.  *See Baxter v. Baxter*, 27 Ohio St.2d 168 (1971).  The trial court's decision must not be reversed absent an abuse of discretion.  *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997).

{¶ 19} The failure of the parties to file a shared parenting plan does not ultimately decide the issue.  The communication problems between the parties were enormous.  Hanif was not paying his child support, leading to an arrearage of over $4,000 on a child who was less than two-years old.  The visitation schedule had been a problem with Hanif not showing up on time.  Their attitudes toward each other were so bad that transfer of the child occurred in a police station so it could be recorded.

{¶ 20} The mother was breastfeeding and had been the primary caregiver for the child.  If there were no shared parenting, she would be the likely residential parent.  Given the communication problems and other problems between the parties, shared parenting was not in the best interest of anyone.  We find that the trial court did not abuse its discretion in naming Sakhi the residential parent and legal custodian, subject to the parenting time of Hanif as determined by the court.

{¶ 21} The third assignment of error is overruled.

{¶ 22} All three assignments of error having been overruled, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed.

*Judgment affirmed.*

DORRIAN and T. BRYANT, JJ., concur.

> T. BRYANT, J., retired, of the Third Appellate District, assigned to active duty under the authority of Ohio Constitution, Article IV, Section 6(C).

DORRIAN, J., concurring.

{¶ 23} Having carefully reviewed the transcript, I would concur with the majority and would affirm the trial court. I would also note that the transcript reveals that appellant, not appellee, threatened abduction.  The appellee testified that appellant told her, "if you ever try to leave with [the baby], I will just shoot you and I will take him and I will run away within the United States."  Appellee further testified that appellant told her

"the United States is a big place and children go missing all the time and nobody would ever find him."  (Tr. Vol. II, 63.)